## COMMONWEALTH v. BENJAMIN CLARK.

APPEAL BY DEFENDANT FROM THE COURT OF OYER AND
TERMINER OF GREENE COUNTY.

Argued October 28, 1889—Decided January 6, 1890.
[To be reported.]

(*a*) A prisoner and his father were indicted, though separately, as princi-
pals in the commission of a murder; and on the trial of the prisoner,
whose case was first called, there was no direct evidence as to his pres-
ence at and participation in the crime charged.

1. In such case, a declaration of the prisoner, three weeks after the mur-
der and before he or his father were arrested, that "it would take all
pap's got to clear him," and that in the same conversation the witness
heard the murdered man's name used, was inadmissible.

2. Such declaration, made at the time it was, and showing only a knowl-
edge had after the fact, even though it referred to the murder on trial,
could not be admitted as evidence to establish the prisoner's participa-
tion in the crime itself.

3. If a statement, made by the prisoner and offered in evidence against
him as an inculpatory confession, was given voluntarily and without
either threats or the promise of benefit, it is not made inadmissible be-
cause it was reduced to writing after he was sworn before the commit-
ting magistrate.

4. But when such statement has nothing in it which can be construed into
an admission of the prisoner's participation in the crime charged, but
merely a knowledge of the murder had after the fact, it is inadmissible
for another reason, because irrelevant to the issue on trial.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WIL-
LIAMS, McCOLLUM and MITCHELL, JJ.

No. 194 October Term 1889, Sup. Ct.; court below, No. 2
June Term 1888, O. and T.

On January 6, 1888, the grand jury returned as a true bill
an indictment charging George Clark, Frank Clark, Sr.; and
Zach. Taylor, with the murder of Wm. McCausland on Sep-
tember 10, 1887.

On April 3, 1888, a severance was had and the trial of George
Clark was ordered, resulting in a verdict of guilty, on April 14,
1888. The judgment on the verdict was affirmed on writ of
error to this court, on February 11, 1889. See Commonwealth

v. Clark, 123 Pa. 555, where the material facts relating to the murder sufficiently appear.   On January 15, 1889, the indictment of Zach. Taylor was called for trial, resulting in a verdict of guilty, and on May 1, 1889, judgment was passed, which on October 28, 1889, on appeal to this court was affirmed.   See Commonwealth v. Taylor, 129 Pa. 534.

On June 5, 1888, after the trial and conviction of George Clark, an information was made by the widow of the murdered man charging " that she had cause to suspect and did suspect that Benjamin Clark did kill and murder William McCausland, and did assist in the killing and murdering of said William Mc-Causland."   Upon this information the defendant, who was a son of Frank Clark, Sr., was arrested, committed, and on June 20, 1888, an indictment charging him as a principal in the murder was found a true bill by the grand jury.   Issue.

The cause was called for trial on April 4, 1889, and a jury impaneled.   After the admission in evidence of other facts tending circumstantially, as it was claimed, to connect the defendant with the actual commission of the crime, George Calvert was called and sworn for the commonwealth :

The commonwealth : We propose to prove by this witness that about three weeks after the murder he was out hunting in the woods called " Cloud's Woods," and came across the defendant and a man named Newton Hunter, at or near an old coal mine; that he heard the defendant say to Hunter, " It will take all pap's got to clear him ; " and in the same conversation he heard the word " McCausland " used.   This for the purpose of showing guilty knowledge on the part of defendant.

Defendant objects to the testimony as incompetent and irrelevant.

By the court : Objection overruled ; exception sealed.[1]

—The assignment of error did not show what the witness testified to under this offer; nor was any of the testimony taken in the case printed in the paper-books, except that relating to the following offer, which appeared in the paper-book of the commonwealth :

The commonwealth produced a statement in writing sworn to by the defendant on June 20, 1888, before W. T. Webb, a justice of the peace, and claimed to be inculpatory in its character.   Upon a preliminary examination as to the circum-

stances under which it had been made, it was shown, in substance, that the magistrate had been called to see the defendant in the presence and custody of the sheriff, and in the presence of Mr. Huss, the district attorney, and other persons; that Mr. Huss told the defendant in the presence of the magistrate that "he could not hold out any inducement to him to make a statement,—that it might be used against him on his trial;" that the defendant said he was making it of his own free will; that the defendant was sworn, and his statement taken down as he made it, and read over several times, sentence by sentence, and corrected, when he signed it. The statement was then offered in evidence by the commonwealth, "for the purpose not only of showing guilty knowledge on the part of this defendant, but that he was a participant in the murder of William McCausland."

Defendant objects that the statement offered in evidence is irrelevant in itself; and further, it is incompetent for the following reasons : (1) That the statement having been made before the committing magistrate, under oath administered by him before any statement was made by the prisoner, is duress such as constitutes an unlawful condition precedent to such a statement, and was a gross violation of the prisoner's rights under the law. (2) That it was made in the presence of persons in authority ; the district attorney of the county, the committing magistrate and the sheriff; and under circumstances which were calculated to induce the defendant to make untrue statements.

By the court: We are of the opinion from the testimony submitted to the court that at the time the statement was made there was an entire absence of anything like an inducement or threat made to the defendant, but on the other hand, he was warned by the district attorney, who was present, that he could not hold out any promise of favor, and the statement or any statement he might make might be used against him afterwards. This being the case, we think it would be clearly competent on that ground. As to the objection that the oath was administered by the justice before the statement was made, we do not regard that so important as the counsel for the defendant or the commonwealth seem to think. While entirely unnecessary, and we are at a loss to know why the justice

thought it was necessary in a voluntary statement to administer an oath,—why he administered the oath, we are at a loss to know; but it seems he did administer an oath before the statement was taken; but in the absence of any offer of favor or threat by any one, we do not think the fact that the oath was administered renders the statement incompetent. As to the fact that the statement was made in the presence of the committing magistrate, and other persons in authority, this standing alone we do not think would be sufficient to render the statement incompetent; but when coupled with the fact that the testimony of the witnesses showed he was cautioned, we think the statement made in their presence would be competent. As to the relevancy of the statement, taking it in connection with the other testimony in the case, we are of the opinion it should be admitted, and it is competent, so far as it may show any knowledge or connection on the part of the defendant with the crime of which he is charged. The objections urged on the part of the defendant are overruled and the testimony admitted; exception.[2]

The statement thus admitted in evidence was as follows:

The Voluntary Confession made by Benjamin Clark on this day, June 19 and 20, 1888, before me, on oath:

" On Friday night before the murder, Zach. Taylor was up to James Neff's to know when the man would be back, that is, Wm. McCausland, and on the same night he went to Frank Clark, Jr.'s, and stayed there all night. He started away and said he was going on the other side of the river. Zach. Taylor and George Clark had this revolver. George Clark got this revolver of Joe Martin some time before the murder. I seen George Clark have this revolver several times. Do not know who put the marks on the revolver. I saw Zach. Taylor have this revolver the night before the murder of William McCausland. When he went up to James Neff's on Friday night he had a jug of liquor with him. I saw George Clark and Zach. Taylor on Saturday morning of the day of the murder. They went down and crossed the creek and went up the hollow a little after 8 o'clock A. M. George Clark had a shot-gun; Zach. Taylor had the revolver. That's the night before I saw Zach. Taylor have the revolver and Big George Clark have the shot-gun the morning of the murder, and I saw them

going from Frank Clark's and went up the hollow towards where the murder was committed. George Clark told me that Zach. Taylor fired the shot that killed William McCausland. On the same Saturday evening of the murder, I was over at George Clark's, when he told me that they both got some money from William McCausland. We were at the back part of the house when he told me. George told me that they got some bank notes and silver money, but did not tell me the amount. George told me at the same time and at the same place that James Neff got three or four hundred dollars. George Clark came over the river with us the same Saturday night, and we met Jim Neff at our house, and I saw George Clark give Jim Neff some money; I do not know what amount; and I heard James Neff say to George Clark that he wished that we could run across another drover like that; then George Clark went in the house and stayed all night, and Neff went towards home. George stayed all day Sunday and Monday till in the evening; then he started and said he was going home. George Clark told me that the reason that they left the revolver on the ground was, that they seen a man coming down the road, and they were afraid he would ketch them. The man was Areford. That, George Clark told me. George Clark told me that he throwed the man over the stone wall, and took the pocket-books out of McCausland's pockets, and after they got the money they went down back of Cloud's barn; and he told me that they went down along the line fence, that is, George and Zach.; that is what he told me. Then they went on down to Gray's line fence, then they went down the creek; that is what George told me the same Saturday night he stayed at our house. George Clark told me that when they came over to Greene county the night before the murder, that they stole Ben. Provins' boat and crossed in it, and after they crossed they turned it adrift. Big George Clark told me that he was over in Greene county the Wednesday before the murder, and was up in the McCann's Ferry road when James Fordyce went past, and he said he had a revolver with him at the time. George Clark and Zach. Taylor both told me that they had seen little Frank Ewart cross the hollow and go down the road just before the murder. George Clark told me that Zach. Taylor was in the bushes by the stone pile when Mc-

Causland passed along the road. George Clark told me that Zach. Taylor had gone over to Masontown early on Saturday morning and returned to Greene county before the murder. I saw George Clark and Zach. Taylor have right smart of money after the murder, more than poor men generally have. Jim Neff came down to our house on the morning of the murder and said that his horse was not very well, and asked my father for his horse and buggy to go to Fredericktown. Neff got liquor; I saw it when they came back from Fredericktown. I told them that there was a man killed down there. Jim Neff wanted me to come up and swear that I saw the revolver on the ground before he inquired of Dr. Crow about the revolver, and told Neff." (The revolver shown to Ben. Clark and identified by him as being the same revolver that he seen Zach. Taylor have the night before the murder of William McCausland.) "The reason that I know it is the same revolver is by the marks that is on it, that is, J. T. C."

BENJAMIN CLARK.

Sworn and subscribed before me
this 20th day of June, 1888.

W. T. WEBB.

The cause having been submitted to the jury on April 9, 1889, INGHRAM, P. J., a verdict was rendered that the prisoner was guilty of murder in the first degree. A rule for a new trial having been discharged, on August 29, 1889, judgment was passed, when the defendant took this appeal, assigning for error:

1, 2. The admission of the commonwealth's offers.[1][2]

*Mr. Jas. E. Sayers* and *Mr. F. P. Iams* (with them *Mr. T. L. Lincoln*), for the appellant:

1. Did the declaration of the defendant, made in the presence of George Calvert, about three weeks after the murder, even if true, in any manner prove that defendant aided in the killing of the deceased? The father of defendant had not been arrested at that time, but he was suspected and was soon afterward arrested, though he is not yet tried. The declaration itself can have no bearing. But will it do to say that Calvert's testimony that the defendant made it, was unim-

portant and had no weight with the jury? "It must have been impressed on the jury as a material thing. . . . . Whether it tended to the conviction in the minds of the jury of the prisoner's guilt none can tell, and because of that uncertainty it should not have been admitted:" Zell v. Commonwealth, 94 Pa. 274.

2. The sworn statement made by the defendant was inadmissible because (1) it was made by defendant under duress, and (2) it contained nothing tending to prove the defendant guilty of the crime charged. It was made under duress, because made to a magistrate in the presence of the attorneys and officers of the commonwealth, after an oath had first been administered to the defendant by the magistrate. That the defendant expressed a willingness to make a statement under the circumstances, did not authorize the magistrate to add thereto the terrors of the law, both human and divine, in order to wring from him something inculpating others or himself. Duress is defined to be personal restraint; fear of personal injury or imprisonment. The elements of all these exist here. This statement cannot be said to have been made voluntarily, and that is the prerequisite of its admissibility, the defendant being then under arrest and charged with the crime: 1 Taylor on Ev., §§ 888–896; Roscoe's Crim. Ev., 42–49; 2 Starkie on Ev., 52; 1 Greenl. Ev., § 225; People v. McMahon, 15 N. Y 384; Thompson's Case, 1 Leach 291; Commonwealth v. Knapp, 9 Pick. 497; Commonwealth v. Harman, 4 Pa. 270.

*Mr. D. R. P. Huss*, District Attorney (with him *Mr. W. S Anderson*, *Mr. R. F. Downey* and *Mr. S. R. Huss*), for the commonwealth:

1. Does not the declaration made by the defendant before the arrest of Frank Clark, Sr., even before it was known in the community that he would be arrested, but in the light of his subsequent arrest and indictment for the murder, show knowledge by the defendant of his father's complicity in the crime? That knowledge could at that time have been obtained in but one of two ways; either the father imparted it to the defendant, which is altogether improbable, or the defendant was a participant with his father in the commission of the crime. If the admission of the declaration did harm to the defendant in any

way, it was relevant and showed guilty knowledge. On the other hand, if improperly admitted and its admission could do the defendant no harm, this court would not reverse the judgment on that ground : People v. Gonzales, 35 N. Y. 49.

2. An extra-judicial oath which could have no binding effect upon the defendant, will not exclude from admission a free and voluntary confession made under the circumstances detailed in the evidence as to the making of the statement in this case. Had the defendant, under the same circumstances, made this statement at the preliminary hearing before the magistrate, it would have been admissible against him on his trial, since he made it of his own free will without being influenced through fear or promise of favor. Under § 10, act of May 23, 1887, P. L. 161, the defendant " may testify," although he may not be compelled to testify. " Where by statute a prisoner may testify in his own behalf in all criminal proceedings, if he desires, his testimony taken under oath at the preliminary examination, if it appear to have been freely given, without compulsion or promise, is admissible as a confession :" People v. Kelly, 47 Cal. 125. And see Whart. Crim. Ev., § 668; 1 Taylor on Ev., § 889; Jones v. Commonwealth, 29 Pa. 430; Rizzolo v. Commonwealth, 126 Pa. 54. Commonwealth v. Harman, 4 Pa. 270, is clearly distinguishable.

OPINION, MR. CHIEF JUSTICE PAXSON :

The defendant was tried in the court below for the murder of William McCausland. The jury found him guilty of murder in the first degree. If guilty at all, there can be no doubt as to the degree, as it was conceded the murder was perpetrated in the commission of a robbery.

The first specification is not properly assigned, and we might dismiss it without more. The answer to the question is not given, nor is the testimony printed, to enable us to judge whether the answer did the defendant any harm. As, however, the case involves the life of a human being, we will pass over what we regard as a palpable violation of the rules of court. We have referred to this disregard of our rules so often and so pointedly, that we are surprised so little attention is paid to it. In ordinary civil cases we do not notice errors improperly assigned, but the issue here is too momentous to enforce such a practice.

The offer of evidence complained of is as follows:

" George Calvert, on the stand for the commonwealth: We propose to prove by this witness that about three weeks after the murder he was out hunting in the woods called ' Cloud's Woods,' and came across the defendant and a man named Newton Hunter, at or near an old coal mine; that he heard defendant say to Hunter, ' It will take all pap's got to clear him'; and in the same conversation he heard the word ' McCausland' used. This, for the purpose of showing guilty knowledge on the part of defendant."

We must assume that the answer of the witness sustained this offer. The answer was not given, as before stated, but the case was argued here upon the theory that the witness testified as stated in the question. In order to understand the offer, it is proper to say that the father of the defendant, Frank Clark, Sr., was in prison, charged with this same murder, although at the time of the alleged conversation with Hunter he had not been arrested. Two other men, George Clark and Zach. Taylor, had previously been tried and convicted of McCausland's murder. There was no direct evidence of the defendant's presence at and participation in the murder, and the circumstantial evidence upon this point was weak, to state it in the mildest manner. We are, of course, embarrassed by the absence of the testimony, and I can only judge of it from the statements and arguments of the respective counsel. If we are led into error by reason of the meagre presentation of the case, the fault is not ours.

This testimony was offered for the sole purpose of proving guilty knowledge on the part of the defendant. If competent at all, it was not competent for any other purpose. Guilty knowledge of a crime is a very different matter from the commission of the crime. And the guilty knowledge here is only shown after the fact. Had this defendant been indicted as an accessary after the fact, we are of opinion the evidence would have been competent. But he was indicted as a principal; and the guilty knowledge, not shown to have been acquired before or at the murder, was used against him to show his participation in the crime itself. There was not a word in the conversation that referred to the defendant's commission of this murder. He was not speaking of himself at all. He

merely said, "it will take all pap's got to clear him." Even this was vague and indefinite. Clear him of what? It does not follow that it was to clear him of McCausland's murder. Even if it appeared clearly that the defendant was speaking of this murder, and that he had knowledge that his father participated therein, it would be a harsh rule to admit it as evidence of his own guilt as a principal. It is no answer to say that it was admitted for a specific purpose, and that it did the defendant no harm. On the contrary, I have no doubt it had a crushing weight with the jury. I can conceive a case where it would do little harm, and of circumstances where even such evidence might be admissible; but we have here very slight evidence outside of this particular matter, and the confession—to be referred to later—of the defendant's guilt as a principal.

The remaining specification refers to the admission of the defendant's confession or statement. We do not think the objections that it was obtained by duress, and was sworn to, are of much importance. The testimony upon this one point is given in the commonwealth's paper-book, and it shows very conclusively that the statement—it was not a confession—was made of his own free will, and without either threats, or the promise of reward or benefit in the future. The law is always tender and merciful to a defendant. It will protect him against the use of a confession drawn from him by holding out inducements to make it; but, when a criminal wants to ease his mind by a voluntary confession, it would be a weak sentimentalism to interfere with his doing so. Nor do I see that its force as a statement is impaired by the fact that the justice of the peace administered an oath to him. It was a foolish, blundering act on the part of the justice, but it was voluntarily taken by the defendant. The facts bear no analogy to Commonwealth v. Harman, 4 Pa. 269. In that case a prisoner was brought before the justice, charged with homicide. The justice administered an oath to the prisoner, and then told him: "If you do not tell the truth, I will commit you." Under such circumstances we are not surprised that Chief Justice GIBSON condemned the conduct of the justice in this strong language: "The administering of an oath by the magistrate, under such circumstances, was a gross outrage upon the accused. Any information drawn by it, or subsequently given on its basis, is

inadmissible." The fact must not be overlooked that a defendant in a homicide case may now take the stand, and be sworn as a witness on his own behalf. There would seem to be no good reason why he may not of his own motion go before a magistrate, and make a voluntary statement under oath. It is quite a different matter where the oath is administered against his will.

We see nothing, then, in the circumstances under which this statement was made to exclude it. But we think it was inadmissible upon other grounds. There is not a word in it which can be construed into an admission of defendant's participation in the murder. The most that can be fairly claimed for it is a confession of guilty knowledge after the fact. It would have been proper evidence had he been on trial as an accessary after the fact. But he was not on trial for that offence. It was a damaging piece of testimony, and in our opinion should have been excluded.

> The judgment is reversed, and a venire facias de novo awarded.