Commonwealth *v.* Jaunes, Appellant.

Argued December 11, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Stanley F. Coar,* with him *Everett Rosser* and *Louis A. Fine,* for appellant.

*Sidney L. Krawitz,* Assistant District Attorney, with him *J. Wilson Ames,* District Attorney, for appellee.

OPINION BY STADTFELD, J., March 2, 1940:

This is an appeal by defendant from the sentence and judgment of the court on a conviction on an indictment for arson.

Wilbur Jaunes and his wife, Anna Jaunes, were the lessees of a building known as the Indian Orchard Hotel located on a much traveled highway, (U. S. Route 6),

about two miles from Honesdale, in Wayne County, Pa., where they conducted a hotel and restaurant business and sold liquor under a license issued by the Pennsylvania Liquor Control Board. They resided in Canaan, which is approximately ten miles from the said hotel.

On September 27, 1938, Jaunes endeavored to procure a container for stove gasoline which he needed for fuel purposes in the cook stove at the hotel. He had been using this type of gas at both places of business for cooking purposes for some time. He finally obtained a five-gallon container and thereafter purchased three gallons of the stove gas at a public place where he had purchased such gas before. Thereupon, he and his wife proceeded to the hotel, arriving there about 12:00 o'clock noon. The business was closed in compliance with the regulations of the Liquor Control Board as a local election was then being held in the township where the hotel was located. Jaunes started a wood fire in the furnace of the hotel for the purpose of taking the dampness out of the building, and his wife cleaned several of the rooms on the second floor of the building. She also aired a few of the rooms by opening the windows. Jaunes, with the assistance of the owner of a garage next to the hotel, repaired a defective float in the lavatory. Thereafter, Jaunes, using a pail located in the kitchen, poured some of the stove gas into the cook stove which had been in the hotel and had been used with the same type of gas for nine months. He left the remainder of the gas in the container in its usual place in the kitchen and he and his wife prepared a meal for themselves. The day being bright and pleasant, they left the hotel about 3:00 p.m. and went pleasure riding in their automobiles in the surrounding country, intending to go fishing, such trips being customary with Mr. and Mrs. Jaunes on a day off.

About 4:30 p.m. a neighbor noticed smoke escaping from the eaves of the hotel. She called this to the attention of the garage owner, who, with the assistance

of another, dashed into the building and discovered fire in the attic of the third story of the building. They carried water in the pail used by Jaunes for the stove gas and used this in an effort to extinguish the fire. The fire company arrived soon after and succeeded in extinguishing the fire. The entire fire was confined to the burning of the ceiling in one of the rooms on the second floor, comprising an area four feet square, the damage amounting to approximately $100. The fire was directly where a live electric wire ran through, which was found to have been burned and which, it was shown, could have short-circuited. In the attic, directly over the fire, were found two mattresses and a rug laid on top of each other, the bottom mattress was practically consumed by the fire, the mattress directly over it was not damaged. The mattress and rug were removed from the hotel by order of the fire chief and laid on the macadam highway in front of the building where they remained for two hours, until removed by the state police. The mattress and rug were saturated with the water which had been thrown on them. It also appeared that the unconsumed mattress and rug were saturated with gasoline, when removed from the road by the state police.

Jaunes and his wife, on their return from their ride, passed the hotel about 7:00 p.m., but the crowd had already dispersed and seeing nothing unusual about the place, the only damage being inside of the building and not apparent from the outside, they drove on to a restaurant a few miles therefrom, towards their home, and ordered a meal. The waitress informed Jaunes of the fire that had occurred at the hotel, and he and his wife immediately left the restaurant and returned to the hotel. After inspection of the premises and the damage done, they departed for their home in Canaan, near Waymart, Pa.

Between 10:00 and 11:00 o'clock that evening, Corporal Knight, of the state police, and J. C. Milligan

and Edward McLaughlin, called at the defendant's home in Canaan and requested him to go with them to the Indian Orchard Hotel as they wanted to ask him some questions. The defendant voluntarily and unhesitatingly went along and was interrogated by Corporal Knight while at the Indian Orchard Hotel for a little over an hour. At the time Corporal Knight, J. C. Milligan and Edward McLaughlin called for Mr. Jaunes at his home, one Fred Neilsen, who occasionally assisted Wilbur Jaunes in his place of business, was reading a Popular Mechanics Magazine which contained an article "Setting Traps for Fire Bugs," and Mr. Jaunes took the magazine from Fred Neilsen and showed the article to Corporal Knight and jestingly said to him, "Here is an article, 'Setting Traps for Fire Bugs' ". Wilbur Jaunes was arrested about six days thereafter and charged with the felonious burning of the building under the Act of April 25, 1929, P. L. 767.

From the testimony, it also appears that on October 5, 1937, Wilbur Jaunes and his wife, Anna Jaunes, entered into a lease with Peter Maushart, of the building known as "Indian Orchard Hotel". The rental was to be $100 per month, such monthly payments to apply on the purchase price of $8500, and title to pass when the total rental payments equalled that amount. Jaunes owned personal property on the premises on September 27, 1938, the date of the fire, upon which he placed, by his own testimony, a value of about $350 and which was insured in his name in the sum of $2000. At the conclusion of the testimony, defendant asked for a directed verdict in his favor, which was denied. The jury found him guilty. A motion was made to have the verdict set aside, and a new trial granted, which the lower court, in an opinion by SWOYER, P. J., refused and sentenced the defendant to serve eighteen months to three years in the Eastern Penitentiary from which judgment and sentence this appeal was taken.

There are eleven assignments of error, but it is not

necessary to discuss all of them, in view of the fact that we are required to sustain two of them which require a reversal of the judgment and necessitate a new trial.

The seventh assignment relates to the alleged failure of the court to review the evidence in the charge.

The trial consumed six days and the testimony was voluminous and the same, according to the opinion of the trial judge, was reviewed by both sides at great length, and for that reason he felt to again recite it would have served no useful purpose. The arguments of counsel do not form a part of the record and we cannot pass upon their review. We quote from the charge of the court: "Now, we do not intend to go over the testimony in this case for you. It is comparatively fresh in your minds and it has been very ably and completely reviewed by counsel and we see no useful purpose in discussing it further before you. You will, however, not accept the recollection of counsel of the testimony but your own recollection, for the evidence and the testimony is entirely for you."

This omission on the part of the learned judge was most unfortunate in view of the fact that the charge is remarkably fair and comprehensive in all other respects. Because of the length of the trial, and the review of the testimony by opposing counsel, the jury was entitled to the assistance of the court in an impartial review of the testimony in its essential features. This view is in no way contradictory of the rule propounded in *Borham v. Davis,* 146 Pa. 72, 23 A. 160, to the effect that it is largely within the discretion of the trial judge as to how much detail shall be entered into, how minute the reference to the testimony shall be and how extended the discussion.

In the case of *Com. v. Kaiser,* 184 Pa. 493, 39 A. 299, Mr. Justice MITCHELL, in speaking for the Supreme Court said, at p. 499: "It is enough if he (the trial judge) gives to a jury a general review of the evidence

on the one side and the other, which fairly and adequately presents the respective contentions of the parties, with enough reference to the items of evidence to assist the jury in recalling it as a substantial whole, and to appreciate its bearing." See also *Com. v. Colandro*, 231 Pa. 343, 356, 80 A. 571.

The language of Mr. Justice ELKIN in *Weiss v. Pgh. Rys. Co.,* 242 Pa. 506, 89 A. 586, is pertinent to this case, at p. 510: "There can be no just criticism of the general charge of the learned trial judge. The respective theories of the contending parties were fairly and impartially submitted to the jury, but there was a failure to point out the kind and quality of the evidence and to clearly direct the attention of the jurors to the testimony relating to the controlling fact in the case. True, this was a case for the jury, but it is the duty of courts to do what can be done within the proper exercise of their powers to aid in the just administration of the law."

The eleventh assignment of error relates to the action of the court in sustaining the right of the jury to have with them and consider the contents of the scientific article entitled "Setting Traps for Fire Bugs."

Corporal Robert E. Knight, in his testimony in chief, referred to a magazine article which he stated the defendant was reading when Knight called at the defendant's home several hours after the fire to interrogate him in reference to the fire. "By the District Attorney: Q. What was he doing in the kitchen when you went there? A. He was having a cup of coffee and reading a magazine and when he got up from the table he handed me his magazine and said he was just reading an article about fire bugs. Stenographer's Note: At this time Mr. Ames picks up a magazine. Mr. Fine: Page 498. Witness: I know the page. Mr. Ames: Thank you, Mr. Fine. (At this time the Stenographer marks a magazine, at page 498, 'Commonwealth's Exhibit No. 11')

Q. I show you Commonwealth's Exhibit No. 11 and ask you what this is? A. That is the Popular Mechanics Magazine which was handed me by Wilbur Jaunes in the kitchen of his Beer Garden at South Canaan, on the evening of September 27th. Q. Is that the article (indicating)? A. That is. Q. What is the name of the article? A. Setting Traps for Fire Bugs." Counsel for the defense thereafter made an affidavit which set forth the reasons for motion for withdrawal of a juror. This motion, the court refused.

There was some dispute as to whether or not the magazine in question had been admitted in evidence, but the court below disposed of this question to its own satisfaction, in its opinion by "amending the record insofar as may be necessary to show the admission in evidence of Commonwealth's Exhibit No. 11, being issue of Popular Mechanics Magazine, issue of October 1938." Assuming then that the magazine in question had been offered and admitted in evidence, it should be noted that immediately following the court's refusal of defendant's motion for withdrawal of a juror, counsel for defendant moved that the testimony of Corporal Knight referring to the magazine article be stricken from the record and that the jury be cautioned to disregard the testimony. Defendant's objection to the admission of the evidence in question thus appears of record. These motions, however, were refused, the court ruling that the testimony of Corporal Knight "having dealt with admissions on the part of the defendant which when against interest are always admissible," was unobjectionable.

The jury were permitted to take with them the magazine in question containing the article entitled "Setting Traps for Fire Bugs."

The article contained in the magazine is a lengthy treatment by Capt. Everett Harris, Chief Investigator of the Arson Bureau of Los Angeles Fire Department. It treats of the methods employed by those guilty of

incendiarism and gives many instances of such cases and how they have been detected.

The court below, in its opinion, sustained the admissibility of this magazine article in evidence "as part of the res gestae and as tending to show a guilty conscience with regard to a fire occurring on the premises" and said, ".......it is to be borne in mind that the defendant, without any previous notice of any fire, voluntarily exhibited this magazine to Corporal Knight and called his attention to the article on 'How to Catch Fire Bugs.' "

The testimony of the Commonwealth's witness, pertaining to the conduct and declarations of the defendant under the circumstances of the former's presence at the home of the defendant on the evening of the fire, is, in our opinion, inadmissible. The court below should have excluded it. The conduct of the defendant, in handing the current number of the magazine article to the witness and declaring that he was just reading an article about fire bugs, cannot be construed into an admission from defendant of any participation in the crime on his part. Nor can the testimony in question be regarded as evidence of defendant's guilty knowledge of the fire, for contrary to the statement of the court below that defendant had no "previous notice of any fire," the record clearly shows that notice of the fire came to his attention several hours before the Commonwealth's witness came to defendant's home to make investigation. In fact it appears that defendant had himself visited the scene of the fire earlier in the evening. The testimony was irrelevant and prejudicial, failing to connect defendant in any way with the commission of the crime.

The court below did not restrict the admissibility of the evidence to defendant's declaration, but admitted the contents of the article, and indeed, the entire magazine into evidence. This action was, we believe, prejudicial error. Not only were the contents of this article printed declarations of a third party, not himself a

witness, but the article contained nothing to connect the defendant with participation in the setting of the fire. The admissibility of the article itself into evidence violates the hearsay rule; the contents are irrelevant to the issues, and grossly prejudicial to defendant.

In *Com. v. Clark,* 130 Pa. 641, 18 A. 988, the defendant was indicted for murder. At the trial of the case, there being no direct evidence as to his presence at and participation in the crime, a written statement made by the prisoner himself was received over objection into evidence against him as an inculpatory confession. The defendant was found guilty. The Supreme Court, ruling the statement inadmissible, reversed the judgment and awarded a new trial, saying on p. 651: "There is not a word in it which can be construed into an admission of defendant's participation in the murder...... It was a damaging piece of testimony, and in our opinion should have been excluded." In the instant case, the prejudicial contents of the article were not even the statements of the defendant, and had no connection whatsoever with the commission of the crime.

The fact that the magazine containing the article in question was sent out with the jury aggravated the damage suffered by defendant at the trial of his case. Where it is error to admit certain documents into evidence, the error is greater in sending them out with the jury for consideration: *Kittanning Ins. Co. v. O'Neill,* 110 Pa. 548, 1 A. 592; see also, *Stewart et al. v. Huntingdon Bank,* 11 S. & R. 267, holding it improper to send irrelevant papers out with the jury.

The seventh and eleventh assignments of error are sustained.

Judgment is reversed and new trial granted.

KELLER, P. J., BALDRIGE, J., and RHODES, J., would discharge the defendant.