Commonwealth *v.* Turner, Appellant.

Argued November 24, 1947. Before MAXEY, C. J.,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

Edwin P. Rome, with him C. Budd Palmer, for appellant.

Colbert C. McClain, Assistant District Attorney, with him John H. Maurer, District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, March 23, 1948:

This is an appeal by Aaron Turner from a conviction of murder in the first degree, committed during the perpetration of a robbery. The sentence fixed by the jury was death.

The defendant and Jasper Johnson, alias "Fats" and "Playboy", entered the Ace Broom factory located at 355-57 North 2nd St., Philadelphia, at or about five o'clock Saturday afternon, December 15, 1945, with the intention of committing a robbery. Clarence Lofton remained in front of the establishment as "look-out". Turner, who was armed with an iron sash-weight, entered the premises first. There he and Johnson met Frank Endres, a factory employee. Turner twice struck Endres over the head with the iron, felling him and Johnson "got his wallet from him." The proprietor, Charles Simmons, who was in the rear of the store, upon hearing the scuffle came to the front. When he appeared he was hit "a couple of times and he went down". Turner "went into his pockets" and took the

wallet containing "over $100". The two felons left the building, joined Lofton, divided the loot and went to a taproom at "8th and Callowhill and had a few drinks". A policeman passing the premises discovered that the door was open and entered the place. He found the victims lying in "pools of blood and beaten about the head". He had them removed to the hospital. Two days later Endres died. Simmons died seven days later. There were no witnesses to the crime except its victims and perpetrators.

Defendant was arrested without warrant at 11 a.m., June 3, 1946, six months after the commission of the crime. Information leading to his arrest was volunteered by Lofton, who was apprehended on May 25, 1946 in connection with an investigation conducted into a series of crimes. Johnson was arrested on June 3, 1946 about four-thirty in the afternoon. Turner was held in police custody until June 8, 1946 when he was brought before a magistrate.

At the trial Detective Daniel O'Mahoney testified that Turner was arrested at 11:00 a.m. on June 3, 1946, and was taken to the office of the Homicide Division in City Hall and interrogated about the killing of Endres and Simmons. No threats were made against him and no promises were given him. He was questioned a few hours every day until June 7th, when Turner said he wished to tell the truth, that what the other two men had told about him was true and that he would tell all about it. Turner said: "I was at the broom factory and I struck two men with a piece of iron". On the first day of his arrest Turner was interrogated for about three hours and on the next day for about three hours. This continued for five days until the admission of guilt was made. Detective Fisher also questioned the defendant in O'Mahoney's presence. "Sometimes Detective Carey was there and sometimes Detective Lennon was there and Sergeant Riccardi was there and Detective Thompson was there and Lieutenant Kelly took an active part in the questioning of this man." Sometimes the question-

ing was done in Turner's cell and sometimes in a room about 12 feet square at police headquarters. He said that during this period Turner never asked us "to get in touch with his friends or relatives". He was asked: "Did you ever tell Turner anything he might say could be used against him?" He said that he did so "on the night that he said he wanted to tell the truth. That is the 7th of June".

The questions asked Turner and the answers which he gave after he said he wished to tell the truth were taken down stenographically and transcribed. Turner signed each of the sheets of the transcript containing the questions and answers. Turner described the weapon he used in the killing as "a piece of iron, about 11 inches long, 2½ inches wide, ½ inch thick, with a hole in the end." He was asked: "How many times did you hit the white men over the head when you entered the premises at 355 North 2nd Street on December 15, 1945, at about 5:00 p.m.?" He answered: "I hit the first man twice and I seen Fats get his wallet from him. Q. How many times did you hit the second man? A. I only hit him a couple of times and he went down and I went into his pockets and his wallet and took the wallet and went out with it. There was something over $100.00. I don't know how much. I threw it away while walking out Callowhill Street. Q. How much money did you give Clarence Lofton? A. $87.00. Q. How much money did you give Jasper Johnson, alias Fats? A. I didn't give him any money. He said he got $50.00. Q. How much money did Jasper Johnson give you? A. I don't know how much he gave me but I gave Clarence $87.00, out of it and I kept $75.00."

Jasper Johnson and Clarence Lofton also made statements about the killing. These statements were all made in the presence of Turner and they agreed in detail. Each one of the three accused signed each page of each statement.

At the trial Turner denied the truth of his confession and asserted that it had been procured from him by fear and physical abuse. In submitting to the jury the question whether or not the confession was voluntary and uncoerced the trial judge correctly said: "Then, before the confession may be admitted in evidence, the jury must be satisfied beyond a reasonable doubt that the confession has been a free and voluntary one, not induced by fear, coercion, or promise held out, or inducement held out to the defendant. You must first find that the confession was a voluntary statement made by the defendant of his own free will. That seems to me to be the crux of this case.

"For the same reason, if you do not believe this confession was a free and voluntary one, then you have no right to consider it in the evidence. If you believe beyond a reasonable doubt it is a free and voluntary confession, not induced by fear, coercion or inducement held out, or by threats made, then you may accept the confession in your consideration of all the evidence."

On the factual issue the jury after hearing the evidence found against Turner and accepted his confession as being uncoerced and true. As to the confession the court well said in its opinion refusing a new trial: ". . . the defendant is not a poor negro of a low degree of intelligence. From an observation of him and listening to his testimony, it is apparent that he is a smart, clever individual. It is apparent that his confession was not concocted by others, and it is clear that it is not a fabrication created by another mind or minds. The statement as given by the defendant is logical and only consistent with his guilt and that of his confederates. It shows that the defendant had this broom factory under observation two days before the murders and that he and his confederates went to the factory on that Saturday afternoon after the close of the business day, for the purpose of robbery. . . . The confession of the defendant and the confessions of his confederates stated what each

gave to the other in the way of cash after they had fled from the scene of their crimes. The confession of the defendant shows that in going out Callowhill Street, he threw the sash weight away; that the three confederates then went to saloons where they had some drinks, and that they then parted, promising each other that they would say nothing about the crime. A reading of the confession shows that the defendant was asked whether he had been threatened or harmed and whether he had been promised anything, and it also contains the caution that anything he might say, might be used against him. The defendant was asked if he knew, when he was arrested, what the charge was and he said, 'yes, sir, for the murdering of those two men in the broom factory.' "

Anyone with experience in the administration of criminal law who reads the answers Turner made to the questions put to him will readily conclude that the statements he made to the officers were not those of a coerced or scared witness but that they were the statements of a man who had committed a murder and whose recital of its details was clear and explicit. The teller of the gruesome story of this double murder was obviously drawing on his memory and not on a fear-fired imagination. His narrative dovetailed so accurately with the physical facts surrounding the crime and with the story told by his accomplices that there can be no reasonable doubt of the story's truthfulness.

We said in *Commonwealth v. Spardute*, 278 Pa. 37, 48, 122 Atl. 161, that "Where, by the Commonwealth's witnesses, it is shown that a confession is made voluntarily, without such threat or inducement as might secure a false confession, it must be admitted. If afterwards the defendant testifies, or produces other witnesses who testify, that it was not voluntarily made, it becomes a question for the jury." (Citing six cases and citing also Underhill on Criminal Evidence, 2d ed., section 126, p. 242.)

In *Commonwealth v. Jones,* 341 Pa. 541, 19 A. 2d 389, we held that the mere fact that defendant was under arrest or was in charge of armed officers and that he was not represented by counsel at the time he made his confession will not make the confession involuntary. As Chief Justice PAXSON, speaking for the court, said in *Commonwealth v. Clark,* 130 Pa. 641, 650, 18 Atl. 988, ". . . when a criminal wants to ease his mind by a voluntary confession, it would be a weak sentimentalism to interfere with his doing so."

There is nothing in the Constitution [1] or the statutes [2] of Pennsylvania or in the decisions and opinions of this court during the two and a quarter centuries of its existence, requiring that a convicted murderer be turned loose merely because he has not been taken before a magistrate immediately after his arrest or because he was held five days in jail and interrogated a few hours each day by police officers without being given an opportunity to consult with counsel or with friends. Of course, if during that period he was denied food, water, sleep or rest, or if he was beaten or manhandled or threatened or given inducements to confess his guilt, any admission of guilt extracted from him by such means would be judicially rejected as worthless.

We find nothing in any decision of the United States Supreme Court applying the "due process of law" guar-

[1] Pennsylvania's equivalent of the "due process" provision of the 14th Amendment to the United States Constitution is found in Article I, section 9, the last sentence of which reads as follows: ". . . nor can he [the accused] be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land." "Law of the land" means due process of law: *Norman v. Heist,* 5 W. & S. 171, 40 Am. Dec. 493 (1843).

[2] The Act of May 31, 1718, 1 Sm. L. 105, sec. 4, 19 PS 783, requires the courts to assign "learned counsel" to prisoners upon all trials of capital crimes. This is also required by the Act of March 22, 1907, P. L. 31, sec. 1, 19 PS 784, which also provides for compensation and expenses for such assigned counsel. This has never been interpreted to mean that counsel must be provided for persons accused of capital crimes as soon as those persons are taken into custody. See *Com. ex rel. McGlinn v. Smith,* 334 Pa. 41, 24 A. 2d 1.

antee of the 14th Amendment which would justify us in adjudging Turner's confession inadmissible and which would thereby require his release from custody. The United States Supreme Court has frequently declared in effect that a state's long-established interpretation of its own constitution's "due process" clause is entitled to respect and great weight by the Federal judiciary. In *Otis Co. v. Ludlow Co.*, 201 U. S. 140, 154, Justice HOLMES speaking for the court said: "we cannot wholly neglect the long settled law and common understanding of a particular State in considering the plaintiff's rights. We are bound to be very cautious in coming to the conclusion that the Fourteenth Amendment has upset what thus has been established and accepted for a long time."

Appellant bases his plea for release chiefly upon the case of *McNabb v. United States*, 318 U.S. 332. The decision in favor of the prisoners in that case, who had been convicted of murder in a Federal District Court, was expressly based on "the standards" of federal criminal procedure. The Supreme Court after stating that it had "on Constitutional grounds, set aside convictions, both in the federal and state courts, which were based upon confessions 'secured by protracted and repeated questioning of ignorant and untutored persons, in whose minds the power of officers was greatly magnified,' [citing case] or 'who have been unlawfully held incommunicado without advice of friends or counsel,'" [citing cases] said:

"In the view we take of the case, however, it becomes unnecessary to reach the Constitutional issue pressed upon us. For, while the power of this Court to undo convictions in state courts is limited to the enforcement of those 'fundamental principles of liberty and justice,' Hebert v. Louisiana, 272 U.S. 312, 316, which are secured by the Fourteenth Amendment, the scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity. . . . Moreover, review by this Court of state

action expressing its notion of what will best further its own security in the administration of criminal justice demands appropriate respect for the deliberative judgment of a state in so basic an exercise of its jurisdiction. . . . Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioners in the circumstances disclosed here must be excluded. For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them. . . . The circumstances in which the statements admitted in evidence against the petitioners were secured reveal a plain disregard of the duty enjoined by Congress upon federal law officers. . . . In holding that the petitioners' admissions were improperly received in evidence against them, and that having been based on this evidence their convictions cannot stand, we confine ourselves to our limited function as the court of ultimate review of the standards formulated and applied by federal courts in the trial of criminal cases." [3]

The McNabb case is clearly *not* an authority for holding that a conviction *secured in a state court* by the confession of a defendant will be set aside as a violation of the "due process" clause of the 14th Amendment because the prisoner was not immediately taken before

---

[3] Justice REED in his dissenting opinion said: "Now the Court leaves undecided whether the present confessions are voluntary or involuntary and declares that the confessions must be excluded because in addition to questioning the petitioners, the arresting officers failed promptly to take them before a committing magistrate. The Court finds a basis for the declaration of this new rule of evidence in its supervisory authority over the administration of criminal justice. I question whether this offers to the trial courts and the peace officers a rule of admissibility as clear as the test of the voluntary character of the confession. I am opposed to broadening the possibilities of defendants escaping punishment by these more rigorous technical requirements in the administration of justice. If these confessions are otherwise voluntary, civilized standards, in my opinion, are not advanced by setting aside these judgments because of acts of omission which are not shown to have tended toward coercing the admission."

a magistrate or because he was interrogated without the presence of friends or counsel.

In *United States v. Mitchell*, 322 U.S. 65, where it was held by the United States Supreme Court that the admission of guilt by a prisoner was admissible in evidence in a criminal prosecution in a federal court, and that the admissibility of the evidence was not affected by the subsequent illegal detention of the suspect for eight days before arraignment, Mr. Justice REED in his concurring opinion said: "As I understand McNabb v. United States, 318 U.S. 332, as explained by the Court's opinion of today, the McNabb rule is that where there has been illegal detention of a prisoner, joined with other circumstances which are deemed by this Court to be contrary to proper conduct of federal prosecutions, the confession will not be admitted. . . . If the above understanding is correct, it is for me a desirable modification of the McNabb case. . . . The juristic theory under which a confession should be admitted or barred is bottomed on the testimonial trustworthiness of the confession. If the confession is freely made without inducement or menace, it is admissible."

A recent case in the United States Supreme Court on this subject is that of *Malinski et al. v. New York*, 324 U.S. 401, in which the Court in a "five to four" decision held that the confession by an accused was inadmissible in evidence as being a coerced confession. The majority decision was based upon a statement which was made by the prosecuting attorney in summing up his case for the state, in which he used the following language: " 'Why this talk about being undressed? Of course, they had a right to undress him to look for bullet scars, and keep the clothes off him. That was quite proper police procedure. That is some more psychology—let him sit around with a blanket on him, humiliate him there for a while; let him sit in the corner, let him think he is going to get a shellacking.' "

360

The Supreme Court said: "If we take the prosecutor at his word, the confession of October 23rd was the product of fear—one on which we could not permit a person to stand convicted for a crime." The Supreme Court then added, "But it is said that this coerced confession was not introduced in evidence, that it was submitted to the jury only insofar as it threw light on the voluntary character of the subsequent confessions. . . ." The Supreme Court further said: "There were repeated references at the trial to the confession of October 23rd. The prosecutor made emphatic references to it in his summation. On this record the fact that Malinski confessed to the crime shortly after he was arrested stands out in bold relief. The use made of the confession could hardly have been more effective had its details been put in evidence. It was not insulated from the trial." The Supreme Court then said: "We must consider the case, therefore, as one in which a coerced confession was employed to obtain a conviction." In that case Chief Justice Stone in his dissenting opinion, in which he was joined by Mr. Justice Roberts, Mr. Justice Reed, and Mr. Justice Jackson, said:

"And the jury was instructed that it could consider the second confession, only if it found it voluntary, and that it could convict in that case. In view of these instructions, we cannot say that the first confession was submitted to the jury, or that, in the absence of any exception or request to charge more particularly, there was any error of which petitioner can complain. Hence the jury's verdict must be taken as conclusively establishing that the second confession was voluntary and was not induced by any coercion attending the first. Lyons v. Oklahoma, 322 U.S. 596. . . . It is not the function of this Court, in reviewing, on constitutional grounds, criminal convictions by state courts, to weigh the evidence on which the jury has pronounced its verdict, also in the light of the arguments of counsel, or to sit as a super-jury. We have, in appropriate cases, set

aside state convictions as violating due process where we were able to say that the case was improperly submitted to the jury or that the unchallenged evidence plainly showed a violation of the constitutional rights of the accused. . . . The due process clause of the Fourteenth Amendment is concerned with matters of substance. It cannot rightly be made the instrument of reform of the manners of state officials. And however reprehensible or even criminal the acts of state officials may be, in so far as the conduct of the trial is concerned, they do not infringe due process unless they result in the use against the accused of evidence which is coerced or known to the State to be fraudulent or perjured, or unless they otherwise deny to him the substance of a fair trial, which is due process. [Citing cases.] Judged by these standards, we think that there was no denial of due process in submitting petitioner Malinski's confession to the jury in the manner in which they were in fact submitted, and that there is no constitutional ground for setting aside the jury's verdict against him."

The majority of the United States Supreme Court held that the remarks of the prosecuting attorney in his summation to the jury amounted to an admission by him that the confession of the prisoner was coerced. The minority took the view that the "prosecutor did not testify in the case . . . or had any knowledge of the alleged coercion . . . the prosecutor's remarks did not tend to prove anything more than his own ineptitude. . . . It is not the function of this Court . . . to sit as a super-jury."

In the instant case there was no coercion of Turner, either admitted or proved. His answers to the questions put to him revealed intrinsically the voluntary character of his statements, and the testimony of the Commonwealth's witnesses furnished additional proof that Turner was not coerced into talking falsely against himself. The trial judge in admitting Turner's incriminating statements and submitting them to the jury with

proper instructions for testing their truthfulness followed the rules sanctioned by this court during its entire existence. In *Commonwealth v. Dillon*, 4 Dallas 105 (1792), this Court said: "If such [incriminating] declarations are voluntarily made, all the world will agree, that they furnish the strongest evidence of imputed guilt. . . . The true point for consideration, therefore, is, whether the prisoner has falsely declared himself guilty of a capital offence?"

In *Commonwealth v. Goodwin*, 186 Pa. 218, this Court in an opinion by Justice MITCHELL cites with approval the following from Wharton on Criminal Evidence, sec. 644: " 'Though it is necessary to the admissibility of a confession that it should have been voluntarily made, that is, that it should have been made without the appliances of hope or fear from persons having authority; yet it is not necessary that it should have been the prisoner's own spontaneous act. It will be received, though it were induced by spiritual exhortations, whether of a clergyman or of any other person; or by a solemn promise of secrecy even confirmed by an oath; . . . or by any deception practised on the prisoner, or false representation made to him for that purpose, provided there is no reason to suppose that the inducement held out was calculated to produce any untrue confession, which is the main point to be considered' ": 1 Greenleaf on Ev., par. 229.

Turner's statements appear to be those of a man whose narrative was based on first-hand knowledge and not on induced fabrication. What he stated fitted into all the admitted facts. The glibness of his answers revealed that he rather enjoyed telling the story of a brutal double murder and his part in it.[4] Anyone believing

---

[4] Turner stated (in addition to what is already quoted in this opinion) that "on Saturday, December 15, 1945" he said to Johnson and Lofton, "we have a job to do and they went with me . . . when we passed in the second door we met the man and I hit him the man with a piece of iron which I had wrapped up in a piece of

Turner's later assertions that he had been coerced into making his incriminating statements about the commission of these murders would be too credulous to be safely entrusted with any part in the realistic work of administering the criminal law with justice both to the accused and to society.

In cases of this kind the duty of the judiciary is to hold the balance true between the safety of society and fair play for an accused. Solicitude for the feelings of an accused must not be permitted to blind either judicial or police officers to the rights of the multitude to have criminals apprehended and their further depredations prevented. Any method of extracting confessions by means which would cause a prisoner to falsely confess guilt in order to be relieved of unendurable immediate suffering will not be tolerated in any civilized state. On the other hand, for a court to hold that a confession made by a well fed and decently cared for prisoner after he has been held in custody a few days without counsel or contact with friends and after he has been questioned a few hours every day by police officers in reference to a crime of which he is suspected, is inadmissible as being a coerced confession would be unrealistic and impracti-

---

newspaper. Q. When you say you looked the place over, the broom factory . . . what did you have in mind? A. I figured it was quiet around there and I figured it was easy money to rob." He stated the size of the weapon he used and mentioned "the hole in the end" of it. Jasper Johnson in his confession, which Turner also signed, said that after they got to the broom factory, "we were met by the smallest fellow, a middle aged man. Tree-top [Turner] slugged him on the side of the head. The fellow was on the floor scuffling, trying to get up. I runs in his pocket pulls out a wallet out of the hip pocket. . . . I looks around to see Tree-top and the other man. He was on the floor and Tree was over him. He had done slugged him." Clarence Lofton, the other confederate, made a statement, which Turner also signed. Lofton, who was the "lookout", said that when they came out of the place Fats or Tree-top said, "One of them wasn't no trouble at all but one of the sons of bitches I had to give a hell of a blow to." From Johnson's statement the man who thus boasted of the "hell of a blow" he gave one of the victims was Turner.

cal. Such a judicial holding would result in a vast increase in the already too large number of felons who go unpunished and are free to prey upon law abiding citizens. These enemies of society naturally endeavor to commit their crimes where there are no witnesses except themselves and their victims. When the victim is killed the murderer feels himself safe. Fortunately for society, criminals soon become possessed of an impulse to disclose their guilty secrets.[5] This impulse is invigorated

---

[5] In the well-known case of *Commonwealth of Mass. v. John Francis Knapp*, 9 Mass. 496, for the murder of Captain Joseph White in 1830, the facts were that the Knapp brothers had for $1,000 hired one Crowninshield to bludgeon and stab to death Captain Joseph White, aged 82, so that Joseph Knapp could through Knapp's mother-in-law inherit (as he erroneously believed) a large portion of Captain White's estate. A little more than two months after the murder, Joseph J. Knapp, on the third day of his imprisonment, confessed his guilt and implicated Crowninshield, who later committed suicide in jail. At the trial of John F. Knapp, Joseph refused to testify for the Commonwealth. Both brothers were convicted and executed. Daniel Webster was special counsel for the Commonwealth. In his closing address for the Commonwealth, Webster, after vividly describing the midnight murder of the "aged victim" and recounting the confidence of the assassin that his guilt would remain undiscovered, said: "He had done the murder. No eye has seen him, no ear has heard him. The secret is his own, and it is safe! Ah! Gentlemen, that was a dreadful mistake. Such a secret can be safe nowhere. . . . the guilty soul cannot keep its own secret. It is false to itself; or rather it feels an irresistible impulse of conscience to be true to itself. It labors under its guilty possession, and knows not what to do with it. The human heart was not made for the residence of such an inhabitant. It finds itself preyed on by a torment, which it dares not acknowledge to God or man. A vulture is devouring it, and it can ask no sympathy or assistance, either from heaven or from earth. The secret which the murderer possesses soon comes to possess him, and, like the evil spirits of which we read, it overcomes him, and leads him whithersoever it will. He feels it beating at his heart, rising to his throat, and demanding disclosure. He thinks the whole world sees it in his face, reads it in his eyes, and hears its workings in the very silence of his thoughts. It has become his master. It betrays his discretion, it breaks down his courage, it conquers his prudence. When suspicions from without begin to embarrass him, and the net of circumstances to entangle him, the fatal secret struggles with

and vocalized by skillful interrogation. The facts just stated are well known to any person with any knowledge of human psychology or with any practical experience in the administration of criminal law. Criminals possessed of this desire to reveal their crime often lose that desire as soon as counsel or "pals" advise them to "keep their mouth shut". In the unending warfare between the criminal and society a due regard for the latter's safety requires that officers should have a reasonable time within which to interrogate an accused while he is in their custody and being fairly treated and without their efforts to elicit the truth being frustrated by persons interested in saving criminals from the just consequences of their crimes.[6] The test to be applied to confessions secured by police officers is this long established and judicially sanctioned one, to wit: "Was the confession secured under such circumstances and by such methods as to make it testimonially trustworthy?" Only when it is manifestly worthless as evidence should it be summarily rejected. Except in those cases where the confession is so obtained as to make its rejection the obvious duty of the trial judge, the jury acting under proper instructions is the tribunal to apply the above test.

Wigmore on Evidence, 3rd Edition, pages 318-319, section 851, pertinently says in justification of the interrogation of accused persons by officers of the law: "Miscalling a thing by a bad name does not make it any worse than it is. Let us therefore ask whether there is

------

still greater violence to burst forth. It must be confessed, it will be confessed, there is no refuge from confession but suicide, and suicide is confession."

[6] In the instant case Turner while in the cell room of City Hall, apparently shortly after his arrest, called "across the top of the cells to Jasper Johnson to stand tight and not to talk." He was then transferred to the station house at 15th and Snyder Avenue. He was later brought back to City Hall "after he had promised not to try to influence other prisoners."

any reason why the traditional process of lengthy continuous interrogations in seclusion, immediately after arrest, calls for exclusion of a confession thus made.

"(1) In the first place, an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, every guilty person is almost always ready and desirous to confess, as soon as he is detected and arrested. This psychological truth, well known to all criminal trial judges, seems to be ignored by some Supreme Courts. The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction.[7] At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession at that moment—the best one. And this expedient, if sanctioned, saves the State a delay and expense in convicting him after he has reacted from his first sensations, has yielded to his friends' solicitations, and comes under the sway of the natural human instinct to struggle to save himself by the aid of all technicalities.

"(2) In the case of professional criminals, who usually work in groups, there is often no hope of getting at the group until one of them has 'peached', and given the clues to the police. The police know this, and have known it for generations in every country. The only ones who apparently do not know it are some of the Supreme Court judges. A thorough questioning of the first suspected person who is caught makes possible the pursuit of the right trail for the others. To forbid this

---

[7] "After this sense of nervous relief has passed, the inclination to tell disappears; and most confessions are in fact made within a short time after arrest." Footnote, page 319, Wigmore, supra.

is to tie the hands of the police. The attitude of some judges towards these necessary police methods is lamentable; one would think that the police, not the criminals, were the enemies of society. To disable the detective police from the very function they are set to fulfil is no less than absurd. Let the judges who sit in judgment on crime look a little into the facts. Let them not sit up aloft and dictate a rule which ignores the well-known facts of criminal life and hampers the needful methods of justice."

Even if it should be decided in a given case that a prisoner had been technically wronged by an officer's refusal to take him before a committing magistrate almost immediately after his arrest for a felony, it does not follow that under the American constitutional system society must be more grossly wronged by having the prisoner turned loose upon it after he has confessed his guilt. Just as in morals "two wrongs do not make a right", so in law committing a wrong against an accused cannot be righted by committing a wrong against society.

This court has always protected accused persons against convictions other than by due process of law. The "due process" provision in the 14th Amendment to the Federal Constitution conferred on citizens of this Commonwealth no rights in addition to those which they had for centuries enjoyed under state judicial protection. As the Supreme Court of the United States in *Mobile & Ohio Railroad v. Tennessee*, 153 U.S. 486, 506, said: "That [14th] amendment conferred no new and additional rights, but only extended the protection of the Federal Constitution over rights of life, liberty, and property that previously existed under all state constitutions." In *Interstate Railway Co. v. Massachusetts*, 207 U.S. 79, 87, Justice HOLMES speaking for the United States Supreme Court said: "The traditions and habits of centuries were not intended to be overthrown when that [14th] Amendment was passed."

We have no hesitation in declaring that the use in the instant case of Turner's confession in no way breached his right to a trial by due process of law. Nor is there any merit in the contention that the joint confessions made by Turner and his accomplices were received in evidence against him. The mutually incriminating statements were made by each of the accused in the presence of all. Not only did Turner hear himself accused by those who at the same time confessed their own guilt but by signing *their* statements he *verified* them. On the authority of *Commonwealth v. Oreszak*, 328 Pa. 65, 195 Atl. 45, and *Commonwealth v. Brooks*, 355 Pa. 551, 50 A. 2d 325, all three statements were admissible. It was also admissible under the authority of *Commonwealth v. Vallone*, 347 Pa. 419 32 A. 2d 889, where this Court held that "when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made."

When Turner was taken to the scene of the homicides, and his two confederates, Johnson and Lofton, reënacted the murders of Simmons and Endres, in the commission of which crimes they assigned Turner the major role, he made no denial of their accusations but stood mute. His guilt of a brutal killing committed in the perpetration of robbery was proved beyond a reasonable doubt and in a fair trial. The jury fixed the only appropriate penalty, that of death.

All the assignments of error are overruled, the judgment is affirmed and the record is remitted to the court below so that the sentence duly imposed may be carried out.

Mr. Justice JONES concurs in the judgment.