## RECK v. PATE, WARDEN.

No. 181. Argued April 19, 1961.—Decided June 12, 1961.

*Donald Page Moore* argued the cause for petitioner. With him on the brief was *Anthony Bradley Eben.*

*William C. Wines,* Assistant Attorney General of Illinois, argued the cause for respondent. With him on the brief were *William G. Clark,* Attorney General, and *Raymond S. Sarnow* and *A. Zola Groves,* Assistant Attorneys General.

MR. JUSTICE STEWART delivered the opinion of the Court.

On the night of January 2, 1936, Dr. Silber C. Peacock, a Chicago physician, left his Edgewater Beach apartment in response to an emergency telephone call to attend a sick child. He never returned. The next day his lifeless body was found in his automobile on a Chicago street. It was apparent that he had been brutally murdered. On Wednesday, March 25, 1936, the petitioner,

Emil Reck, and three others were arrested by the Chicago police on suspicion of stealing bicycles. Late the following Saturday afternoon Reck confessed to participation in the murder of Dr. Peacock. The next day he signed another written confession. At Reck's subsequent trial in the Criminal Court of Cook County, Illinois, the two confessions were, over timely objection, received in evidence against him. The jury found Reck guilty of murder, and he was sentenced to prison for a term of 199 years.

The conviction was affirmed by the Illinois Supreme Court, *People* v. *Reck,* 392 Ill. 311, 64 N. E. 2d 526. Several years later Reck filed a petition under the Illinois Post-Conviction Hearing Act, alleging that his confessions had been procured by coercion and that their use as evidence at his trial had, therefore, violated the Due Process Clause of the Fourteenth Amendment.[1] After a hearing, the Criminal Court of Cook County denied relief. The Supreme Court of Illinois affirmed the Criminal Court's finding that due process had not been violated at Reck's trial. *Reck* v. *People,* 7 Ill. 2d 261, 130 N. E. 2d 200. This Court denied certiorari "without prejudice to an application for a writ of habeas corpus in an appropriate United States District Court." *Reck* v. *Illinois,* 351 U. S. 942.

Reck then filed a petition for habeas corpus in the United States District Court for the Northern District of Illinois. The writ issued, and at the hearing the District Court received in evidence the transcripts of all relevant proceedings in the Illinois courts.[2] In an opin-

---

[1] So far as the record shows, this was the first time after the trial that petitioner raised this issue.

[2] The transcripts of the pre-trial sanity proceedings, of the proceedings at the hearing on the admissibility of the confessions conducted by the trial judge outside the presence of the jury, of the trial proceedings in the presence of the jury, and of the proceedings at the post-conviction hearing.

ion reviewing in detail the circumstances surrounding Reck's confession, the District Court held "the Due Process Clause not violated in the instant case." 172 F. Supp. 734. The Court of Appeals for the Seventh Circuit affirmed, one judge dissenting, 274 F. 2d 250, and we granted certiorari, 363 U. S. 838. The only question presented is whether the State of Illinois violated the Due Process Clause of the Fourteenth Amendment by using as evidence at Reck's trial confessions which he had been coerced into making.

The question whether there has been a violation of the Due Process Clause of the Fourteenth Amendment by the introduction of an involuntary confession is one which it is the ultimate responsibility of this Court to determine. See *Malinski* v. *New York,* 324 U. S. 401, 404; *Thomas* v. *Arizona,* 356 U. S. 390, 393; *Watts* v. *Indiana,* 338 U. S. 49, 51–52. After thoroughly reviewing the record in this case, we are satisfied that the district judge's summary of the undisputed facts is accurate and complete. Neither in brief nor oral argument did the respondent take issue with these findings. No useful purpose would be served by attempting to paraphrase the district judge's words:

> ". . . Emil Reck was at the time of this horrible crime but nineteen years old. Throughout his life he had been repeatedly classified as mentally retarded and deficient by psychologists and psychiatrists of the Institute for Juvenile Research in Chicago. At one time he had been committed to an institution for the feebleminded, where he had spent a year. He dropped out of school at the age of 16, never having completed the 7th grade, and was found to have the intelligence of a child between 10 and 11 years of age at the time of his trial. Aside from his retardation, he was never a behavior problem and bore no criminal record.

"Reck was arrested in Chicago without a warrant at 11:00 a. m. Wednesday, March 25, 1936, on suspicion of stealing bicycles. He was then shuttled between the North Avenue Police Station and the Shakespeare Avenue Police Station until 1:15 p. m., at which time he was returned to the North Avenue Police Station and there interrogated mainly about bicycle thefts until 6:30 or 7:00 p. m. He was then taken to the Warren Avenue Police Station where he spent the night. During this time he was fed a ham sandwich and coffee at the North Avenue Station and a bologna sausage sandwich at the North Avenue Station and a bologna sausage sandwich at the Warren Avenue Station.

"On Thursday, at 10:00 a. m., Reck was brought back to the North Avenue Station where he was interrogated some six or seven hours about various crimes in the District. Afterwards, he was sent to the Shakespeare Station and later that evening he was taken downtown to the Detective Bureau where he was exhibited at a so-called 'show-up.' The record does not indicate where Reck spent the night. The record shows that Reck was fed an egg sandwich and a glass of milk on Thursday but apparently nothing else.

"The record is silent as to where Reck spent Friday morning but it is clear that interrogation was resumed sometime in the early afternoon. Friday evening over one hundred people congregated in the North Avenue Police Station where Reck was exhibited on the second floor. Shortly after 7:00 p. m. Reck fainted and was brought to the Cook County Hospital where he was examined by an intern who found no marks or bruises upon his body and rejected him for treatment. Reck was then taken directly back

to the North Avenue Station where he was immediately again placed on exhibition. He again became sick and was taken to an unfurnished handball room, where a Sergeant Aitken, assigned to the Peacock murder investigation, questioned him about the Peacock murder for a short period of time. Reck again became sick and a Dr. Abraham was called who later testified that Reck was extremely nervous, that he was exposed and that his shirt was unbuttoned and hanging outside of his pants. He was rubbing his abdomen and complaining of pain in that region. After an examination of 60 to 90 seconds, Dr. Abraham left and Reck was questioned intermittently and exhibited to civilians until approximately 9:30 p. m. when he became ill and vomited a considerable amount of blood on the floor.

"Reck was again brought to the Cook County Hospital at 10:15 p. m. on Friday where he was placed in a ward and given injections of morphine, atropine, and ipecac twice during the evening. At about 2:00 a. m. two physicians, Doctor Scatliff and Doctor Day, who were members of a Chicago Medical Society which had been assisting the police in the Peacock murder came at the request of Prosecutor Kearney to see if there were any marks of brutality on Reck. They found the door to Reck's room barred by a police officer. After securing permission from one, Police Captain O'Connell, they went in and found Reck asleep and therefore made only a cursory examination in the dark which revealed nothing conclusive. At 9:00 a. m. on Saturday, Reck told Dr. Zachary Felsher of the Cook County Hospital that the police had been beating him in the stomach. He also told Dr. Weissman of the same hospital that he had been beaten in the abdomen and chest over

a three-day period. This was the first time since his arrest some 70 hours before that Reck had conversed with any civilian outside the presence of police officers. His father had attempted to see Reck on Thursday and Friday at the North Avenue Police Station and on Saturday at the Cook County Hospital. Each time he was refused.

"At 9:30 a. m. on Saturday, Reck was removed from the hospital in a wheelchair and was questioned about the Peacock murder as soon as he was transferred into Captain O'Connell's car to be transported to the North Avenue Police Station, where the questioning continued until the afternoon, when he was taken to the State's Attorney's office at approximately 2:00 p. m.

"Previously to this, on Friday evening, two of the boys, Nash and Goeth, who had been arrested with Reck, had confessed to the murder of Dr. Peacock, implicating Reck and one other boy, Livingston. At about 3:00 a. m. on Saturday, Livingston also agreed to sign a confession. (Upon arraignment, Livingston pleaded not guilty and alleged that he was subjected to physical abuse by the police.)

"On Saturday afternoon, Reck was questioned about the whereabouts of the gun which Goeth had told police that Reck possessed. After intensive interrogation, Reck admitted that Goeth had told him of the Peacock murder. About 4:30 p. m. in front of a group of officers and prosecutors, Reck was confronted with Nash and Goeth. Nash told the story which became his signed confession. Reck denied participation in the crime. Goeth then made the statement that Nash was telling the truth and implicated Reck. At this point Reck stated that he was present at the crime but that Livingston and not he struck Dr. Peacock.

"At 5:55 p. m. of the same Saturday, March 28, 1936, a joint confession was taken, at which time Reck was very weak and sick looking. At this point, Reck had been in custody almost 80 hours without counsel, without contact with his family, without a court appearance and without charge or bail. The text of this joint confession reveals mostly yes and no answer in the case of Reck. The interrogation did not deal with the gun or the automobile used in the crime and was signed by all that Saturday night.

"On Sunday, Reck was again interrogated in the State's Attorney's office and at 4:30 p. m. his individual statement was taken which was more or less a reiteration of the joint confession. The boys then washed up and were given clean clothes. Thereafter, in a formal ceremony in front of numerous officers and prosecutors as well as twelve invited civilians, the statements were read to the boys, they were duly cautioned and the confessions were then signed. The boys did not know there were civilians present and were not permitted counsel. At this time Reck had been without solid food since Friday when he had an egg sandwich. He was placed on a milk diet by the doctor Friday night at the hospital.

"Reck was held in custody Monday, Tuesday and Wednesday, March 30 through April 1. Why, is not revealed in the record. On Thursday, April 2, 1936, Reck was arraigned in open court and pleaded *not guilty*. He had not seen his father or other relatives or any lawyer during this entire period." [3]

---

[3] The brief factual summary in the opinion of the Supreme Court of Illinois affirming the denial of post-conviction relief is entirely consistent with these findings:

"Petitioner was in the custody of the police for a week, during which time he was frequently ill, fainted several times, vomited blood

As the district judge further noted, the record "carries an unexpressed import of police brutality. . . ." Reck testified at length to beatings inflicted upon him on each of the four days he was in police custody before he confessed. His testimony was corroborated. The police, however, denied beating Reck, and, in view of this conflict in the evidence, we proceed upon the premise, as did the District Court, that the officers did not inflict deliberate physical abuse or injury upon Reck during the period they held him in their custody.[4] See *Thomas* v. *Arizona,* 356 U. S. 390, 402–403; *Stein* v. *New York,* 346 U. S. 156, 183–184; *Ashcraft* v. *Tennessee,* 322 U. S. 143, 152–153; *Ward* v. *Texas,* 316 U. S. 547, 551–552.

But it is hardly necessary to state that the question whether a confession was extracted by coercion does not depend simply upon whether the police resorted to the crude tactic of deliberate physical abuse. "[T]he blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn* v. *Alabama,* 361 U. S. 199, 206. The question in each case is whether a defendant's will was overborne at the time he confessed. *Chambers* v. *Florida,* 309 U. S. 227; *Watts* v. *Indiana,* 338 U. S. 49, 52, 53; *Leyra* v. *Denno,* 347 U. S. 556, 558. If so, the confession cannot be deemed "the product of a rational intellect and a free will," *Blackburn, supra,* at 208. In resolving the issue all the circumstances attendant upon the confession must be taken into account. See *Fikes* v. *Alabama,* 352 U. S. 191, 198; *Payne* v. *Arkansas,* 356 U. S. 560, 567. Physical mistreatment is but one such circumstance, albeit a circumstance which by itself weighs heavily. But other circumstances may combine to pro-

---

on the floor of the police station and was twice taken to the hospital on a stretcher. During that week no formal charge was placed against petitioner, and he was confined practically *incommunicado*." 7 Ill. 2d 261, 264, 130 N. E. 2d 200, 202.

[4] This was also the implicit finding of the trial judge.

duce an effect just as impellingly coercive as the deliberate use of the third degree. Such, we think, were the undisputed circumstances of this case, as set out in detail by the District Court.

At the time of his arrest Reck was a nineteen-year-old youth of subnormal intelligence. He had no prior criminal record or experience with the police. He was held nearly eight days without a judicial hearing. Four of those days preceded his first confession. During that period Reck was subjected each day to six- or seven-hour stretches of relentless and incessant interrogation. The questioning was conducted by groups of officers. For the first three days the interrogation ranged over a wide variety of crimes. On the night of the third day of his detention the interrogation turned to the crime for which petitioner stands convicted. During this same four-day period he was shuttled back and forth between police stations and interrogation rooms. In addition, Reck was intermittently placed on public exhibition in "show-ups." On the night before his confession, petitioner became ill while on display in such a "show-up." He was taken to the hospital, returned to the police station and put back on public display. When he again became ill he was removed from the "show-up," but interrogation in the windowless "handball court" continued relentlessly until he grew faint and vomited blood on the floor. Once more he was taken to the hospital, where he spent the night under the influence of drugs. The next morning he was removed from the hospital in a wheel chair, and intensive interrogation was immediately resumed. Some eight hours later Reck signed his first confession. The next afternoon he signed a second.

During the entire period preceding his confessions Reck was without adequate food, without counsel, and without the assistance of family or friends. He was, for all practical purposes, held incommunicado. He was physically

weakened and in intense pain. We conclude that this total combination of circumstances "is so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect against whom its full coercive force is brought to bear." *Ashcraft* v. *Tennessee,* 322 U. S. 143, 154.

It is true that this case lacks the physical brutality present in *Brown* v. *Mississippi,* 297 U. S. 278, the threat of mob violence apparent in *Payne* v. *Arkansas,* 356 U. S. 560, the thirty-six hours of consecutive questioning found in *Ashcraft* v. *Tennessee,* 322 U. S. 143, the threats against defendant's family used in *Harris* v. *South Carolina,* 338 U. S. 68, or the deception employed in *Spano* v. *New York,* 360 U. S. 315, and *Leyra* v. *Denno,* 347 U. S. 556. Nor was Reck's mentality apparently so irrational as that of the petitioner in *Blackburn* v. *Alabama,* 361 U. S. 199. However, it is equally true that Reck's youth, his subnormal intelligence, and his lack of previous experience with the police make it impossible to equate his powers of resistance to overbearing police tactics with those of the defendants in *Stein* v. *New York,* 346 U. S. 156, or *Lisenba* v. *California,* 314 U. S. 219.

Although the process of decision in this area, as in most, requires more than a mere color-matching of cases, it is not inappropriate to compare this case with *Turner* v. *Pennsylvania,* 338 U. S. 62, where we held a confession inadmissible on a record disclosing circumstances less compelling. Decision in *Turner* rested basically on three factors: the length of detention, the amount and manner of interrogation, and the fact that Turner had been held incommunicado by the police. Turner had been in custody for four nights and five days before he confessed. He had been questioned intermittently, as much as six hours in a day, sometimes by one, sometimes by several officers. He had been interrogated a total of some twenty-three hours. Reck was held the same length of time, under basically the same circumstances, before his second con-

fession. He was held some twenty-four hours less than Turner before his first confession, but during that period he was subjected to more concentratedly intensive interrogation, in longer stretches. He also spent considerable periods of time on public display in "show-ups," a factor not present in Turner. In addition, Reck was weakened by illness, pain, and lack of food. Finally, unlike Turner, Reck must be regarded as a case of at least borderline mental retardation. The record here thus presents a totality of coercive circumstances far more aggravated than those which dictated our decision in *Turner.* See also *Johnson* v. *Pennsylvania,* 340 U. S. 881; *Fikes* v. *Alabama,* 352 U. S. 191.

It cannot fairly be said on this record that "[t]he inward consciousness of having committed a murder and a robbery and of being confronted with evidence of guilt which [petitioner] could neither deny nor explain seems enough to account for the confessions here." *Stein* v. *New York,* 346 U. S. 156, 185. It is true that, as in *Stein,* Reck did not confess until confronted with the incriminating statements of his companions. But beyond this the circumstances in *Stein* bear little resemblance to those involved in this case. The defendants in *Stein* were questioned a total of twelve hours during a thirty-two-hour detention. Part of that time was spent working out a "bargain" with police officers. Neither defendant was "young, soft, ignorant or timid." *Stein, supra,* at 185. Nor were they "inexperienced in the ways of crime or its detection" or "dumb as to their rights." *Id.,* at 186. By contrast, Reck was in fact young and ignorant. He was in fact inexperienced in the ways of crime and its detection. Moreover, he was subjected to pressures much greater than were the defendants in *Stein.* He was held incommunicado and questioned over a much longer period. He was physically ill during much of that time, in pain, and weakened by lack of food. Confrontation with the confessions of his companions in these circumstances could

well have been the event which made further resistance seem useless to Reck, whether he was guilty or not. On this record, therefore, the fact that his confession came hard upon the confessions of others who implicated him has little independent significance.

The State has made no effort to distinguish between the Saturday and Sunday confessions. Nor could it properly do so. The coercive circumstances preceding the first confession existed through Sunday. Reck remained in police custody, without a judicial hearing. He was subjected to further interrogation. He did not see counsel, family or friends between Saturday afternoon and Sunday afternoon. There are no other facts in the record suggesting that the Sunday confession was an act independent of the confession extracted on Saturday. Both confessions are subject to the same infirmities. Under the Due Process Clause of the Fourteenth Amendment neither was admissible at Reck's trial.

The petitioner's detention is in violation of the Constitution of the United States, and he is therefore entitled to be released. The judgments of the Court of Appeals and the District Court are vacated and the case remanded to the latter. On remand, the District Court should enter such orders as are appropriate and consistent with this opinion allowing the State a reasonable time in which to retry the petitioner. Cf. *Rogers* v. *Richmond,* 365 U. S. 534, 549; *Irvin* v. *Dowd,* 366 U. S. 717, 729.

*Vacated and remanded.*

Mr. Justice Douglas, concurring.

Emil Reck at the age of twelve was classified as a "high grade mental defective"[1] and placed in an institution for

---

[1] At an interview taking place a few weeks after his arrest in 1936, Reck knew that the Mississippi was a big river, that New York was a big city, that Washington, D. C., was our capital, and that Hoover preceded Roosevelt. But he was unable to divide 25 by 5;

mental defectives. He dropped out of school when he was sixteen. Though he was retarded he had no criminal record, no record of delinquency. At the time of his arrest, confession, and conviction he was nineteen years old.

He was arrested Wednesday morning, March 25, 1936. The next day, March 26, his father went to the police asking where his son was and asking to see him. The police would give him no information. On March 27 his father came to the police station again but was not allowed to see his son. Later the father tried to see his son at the hospital but was denied admission.

The father was denied the right to see his son over and again. The son was held for at least eight full days *incommunicado*. He was arraigned before a magistrate on April 2, 1936, only after he had confessed.

The late Professor Alexander Kennedy of the University of Edinburgh has put into illuminating words the manner in which long-continued interrogation under conditions of stress can give the interrogator effective command over the prisoner.[2] The techniques—now explained in a vast literature—include (1) disorientation and disillusion; (2) synthetic conflict and tension; (3) crisis and conversion; (4) rationalization and indoctrination; (5) apologetics and exploitation.[3]

The device of "synthetic conflict and tension" is summarized as follows: [4]

> "Production by conditioning methods of a state of psychological tension with its concomitant physical

---

he did not know how many weeks were in a year, how many feet in a yard, how many quarts in a gallon, when Columbus discovered America, who the opponents were in the Civil War, or the capitals of Illinois, England, France, or Germany.

[2] Kennedy, The Scientific Lessons of Interrogation, Proc. Roy. Instn. 38, No. 170 (1960).

[3] *Id.*, pp. 96–97.

[4] *Id.*, p. 96.

changes in heart, respiration, skin and other organs, the feeling being unattached to any particular set of ideas. This is later caused to transfer itself to synthetic mental conflicts created out of circumstances chosen from the subject's life-history, but entirely irrelevant to the reasons for his detention. The object is to build up anxiety to the limits of tolerance so as to invoke pathological mental mechanisms of escape comparable to those of Conversion Hysteria."

Whether the police used this technique on Emil Reck no one knows. We do know from this record that Emil Reck was quite ill during his detention. He was so ill that he was taken to a hospital *incommunicado*. He was so ill he passed blood. What actually transpired no one will know. The records coming before us that involve the relations between the police and a prisoner during periods of confinement are extremely unreliable. The word of the police is on the side of orderly procedure, nonoppressive conduct, meticulous regard for the sensibilities of the prisoner. There is the word of the accused against the police. But his voice has little persuasion.

We do know that long detention, while the prisoner is shut off from the outside world, is a recurring practice in this country—for those of lowly birth, for those without friends or status.[5] We also know that detention *incommunicado* was the secret of the inquisition and is the secret of successful interrogation in Communist countries. Professor Kennedy summarized the matter:[6]

"From the history of the Inquisition we learn that certain empirical discoveries were made and recog-

---

[5] "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." Anatole France as quoted in Cournos, A Modern Plutarch (1928), p. 27.

[6] *Id.*, p. 94.

nised as important by a thoughtful and objective minority of those concerned. The first was that if a prisoner were once induced to give a detailed history of his past and to discuss it with his interrogators in the absence of threat or persuasion or even of evidence of interest, he might after an emotional crisis recant and confess his heresies. The second discovery was that true and lasting conversion could never be produced by the threat of physical torture. Torture not infrequently had the opposite effect and induced a negative mental state in which the prisoner could no longer feel pain but could achieve an attitude of mental detachment from his circumstances and with it an immunity to inquisition. The most surprising feature was the genuine enthusiasm of those who did recant. While these results were necessarily ascribed at the time to the powers of persuasion of the Inquistadores, it is evident in retrospect that something was happening which was often beyond their control. The same facts come to light in the long history of Russian political interrogation. In the Leninist period, the success of the immensely tedious method of didactic interrogation then in use was similarly ascribed to the appeal of Marxist doctrine to reason. The fact is that in conditions of confinement, detailed history-taking without reference to incriminating topics and the forming of a personal relationship with an interrogator who subscribes to a system of political or religious explanation, there may occur an endogenous and not always predictable process of conversion to the ideas and beliefs of the interrogator."

Television teaches that confessions are the touchstone of law enforcement. Experience however teaches that confessions born of long detention under conditions of stress, confusion, and anxiety are extremely unreliable.

People arrested by the police may produce confessions that come gushing forth and carry all the earmarks of reliability. But detention *incommunicado* for days on end is so fraught with evil that we should hold it to be inconsistent with the requirements of that free society which is reflected in the Bill of Rights. It is the means whereby the commands of the Fifth Amendment (which I deem to be applicable to the States) are circumvented. It is true that the police have to interrogate to arrest; it is not true that they may arrest to interrogate.[7] I would hold that any confession obtained by the police while the defendant is under detention is inadmissible, unless there is prompt arraignment and unless the accused is informed of his right to silence and accorded an opportunity to consult counsel. This judgment of conviction should therefore be reversed.

MR. JUSTICE CLARK, whom MR. JUSTICE WHITTAKER joins, dissenting.

Twenty-five years ago a jury found Reck guilty of the savage murder of Dr. Silber C. Peacock. His first attempt to upset that conviction came nine years later when he sought a writ of error to the Supreme Court of Illinois. It was denied by opinion, *People* v. *Reck,* 392 Ill. 311, 64 N. E. 526 (1946). This Court denied certiorari. *Reck* v. *Illinois,* 331 U. S. 855 (1947). In the same year the Illinois Supreme Court again denied Reck's applica-

---

[7] In ordinary circumstances, the police, under law, are to conduct investigations of crime by interview, and not by interrogation. Typically, it is the Grand Jury or a Court, not the police, which has the power to compel testimony, subject to the limitations of relevance and privilege. See *United States* v. *Bufalino,* 285 F. 2d 408, 415, 416, 420. To allow the police to use their power to arrest as a substitute for the power of subpoena is, I think, to strip the Fifth Amendment of its meaning.

tion for discharge. The next year the United States District Court for the Northern District of Illinois did likewise. Then, in 1952, an application under the Illinois Post-Conviction Hearing Act was filed to test the validity of Reck's 199-year sentence imposed 16 years previously. His application was denied after a full hearing by the trial court, and the Illinois Supreme Court affirmed by a unanimous opinion. *Reck* v. *People,* 7 Ill. 2d 261, 130 N. E. 2d 200 (1955). Petition for certiorari was again denied, without prejudice to the filing of appropriate proceedings in Federal District Court. 351 U. S. 942 (1956). This case was then filed in the United States District Court where no witnesses were heard, the court being satisfied with reviewing the record. Once again relief was denied, 172 F. Supp. 734, and the Court of Appeals affirmed. 274 F. 2d 250.

Today—25 years after his conviction—this Court overturns the decision of the original trial judge, the judgment and findings of a state trial judge on post-conviction hearing, the unanimous opinion of the Supreme Court of Illinois on that appeal, decisions of both the Supreme Court of Illinois and a federal district judge on separate applications for habeas corpus and, finally, those of a federal district judge and Court of Appeals in this case. All of these courts are overruled on the ground that "a totality of coercive circumstances" surrounded Reck's confession. The Court second-guesses the findings of the trial judge and those of the only other trial court that heard and saw any of the witnesses, both of which courts impartially declared the confession to be entirely voluntary.

The Court has quoted at length and with approval the summary of the evidence by the United States district judge. I quote in the margin the findings of the two state judges who saw the witnesses and heard the evidence,

one a few weeks after the events,[1] and the other sixteen years thereafter.[2] A casual comparison of the three findings shows that the federal judge—to say the least—has imported conclusions and added embellishments not present in the cold record of the trial. I need only cite

---

[1] The original trial judge, after a hearing on the admissibility of the confession, stated:

"The Court has listened attentively to all of the testimony presented in support of the exhibits and against the introduction of the exhibits. The law in this state is that the burden is on the People to establish by a preponderance of the evidence that a confession or what is introduced as a confession was made voluntarily and freely. If there was any coercion or promise of immunity or reward for making the confession, or if the person making the confession was abused in any way either by striking or threatening or any form of mental or physical abuse, then the confessions would not be free and voluntary confessions.

"After considering all the testimony introduced on this preliminary hearing, the Court finds that the confessions are free and voluntary; and the Court is satisfied that that is established not only by a greater weight of the evidence, but by an overwhelming weight of the evidence. Therefore, the Court will admit these confessions. The Court has admitted the confessions. Now, as to the weight that shall be given to the confessions, that is for the jury."

[2] At the conclusion of the post-conviction hearing, the judge stated:

"Well, the defendant testified that he was arrested on March 25th and that he was taken to a hospital on March 27th. Now, without considering the testimony of the police officers at all, Mr. Kearney testified that he was an Assistant State's Attorney at that time and is now practicing law; that on Friday, at about 10 P. M., he went to the North Avenue Station, after having received a phone call from Chief Aitken; that he told everyone there that he was from the State's Attorney's Office; that he called Dr. Scatliff and Dr. Day and had them go to the County Hospital to examine the petitioner because the petitioner had complained that he was ill; that at the time he took the statement of the petitioner, a member of the Grand Jury was present and several doctors were present during the taking of the statement of the petitioner. He said that he and Assistant State's Attorney Crowley, now Judge Crowley, questioned Reck and Reck gave the answers. He says that he saw no marks or bruises

one example, where he finds that his "cold summary . . .
carries an unexpressed import of police brutality . . . ."
While the Court of Appeals, at least *sub silentio,* over-
turned some of these findings, the State does not take
issue with the basic facts in the summary but does strenu-

on Reck. Reck at no time complained of any brutality. No one
struck or threatened Reck in the presence of Mr. Kearney. He says
that he first saw Reck and then the police brought him to the State's
Attorney's Office from the County Hospital. Reck told Mr. Kearney
that he had been to the County Hospital, but he didn't tell him why.
Then Kearney called Dr. Scatliff and Dr. Day at twelve midnight and
asked them to go to the County Hospital to see what, if anything, was
wrong with Reck. Dr. Scatliff testified that he saw Reck at the
County Hospital in the middle of the night on Friday to Saturday and
that Dr. Day was with him. That first, he made a visual examination;
that when he arrived in the room Reck was asleep, but he was aroused,
and Reck was asked if he was ill and Reck merely grunted. The
doctor asked Reck if he was in pain and Reck said 'No.' He asked
Reck what the trouble was and Reck pointed to his stomach. The
doctor then testified that we looked him over, he and Dr. Day;
that he, Dr. Scatliff, found no bruises or discolorations. Dr. Scatliff
said that he pressed on the stomach of this petitioner and the peti-
tioner said nothing. Again, on Sunday, he saw the petitioner and
the petitioner had no marks or bruises; that he was asked if he had
been mistreated and the petitioner said he had not. The petitioner
was asked if he had eaten and the petitioner said he had eaten. On
cross-examination he testified that he did not examine the petitioner's
stool or urine; that he pressed on his abdomen and there was no
evidence of pain; that he had been told that petitioner bled from
the mouth, while at the police station, and he testified that bleeding
from the mouth could be caused by dental disorders, tumors, by
injuries to the stomach, that he had been told that defendant had a
gastric ulcer and that, in his opinion, a gastric ulcer could cause
bleeding. He also testified on recross examination that a blow on
the stomach would aggravate and cause a dormant ulcer to become
active and cause bleeding. Captain Aitken testified that while he
was talking to the defendant, to the petitioner, the petitioner com-
menced to bleed from the mouth; that he asked the petitioner what
the trouble was, and the petitioner said he had ulcers; that then
the doctor recommended that the petitioner be taken to the hospital.
Mr. Blair Varnes also testified, an attorney, that he was present at

ously object to its conclusory findings. Perhaps the explanation for these differences is best explained by the federal judge himself, when he finds that he has read "[t]he record . . . in the light most favorable" to Reck; and further that "Reck's confession was tested before a judge and jury who had the opportunity to observe witnesses and weigh other fresh evidence at first hand while I must make my decision on the basis of a cold and ancient record, *which can appear misleading.*" (Emphasis added.)

Although the Court says that it proceeds "upon the premise, as did the District Court, that the officers did not inflict deliberate physical abuse or injury upon Reck," it nonetheless finds the confession to have been coerced. I assume, therefore, that the Court bases its reversal on psychological or mental coercion. In so doing it goes far beyond the holding of any of the prior cases of this Court.

I shall not repeat the facts except to note that Reck was arrested on Wednesday; he was not interrogated concerning Dr. Peacock's murder until Friday, when he immediately became ill, and was hospitalized; later that night all three of his confederates confessed; confronted with them on Saturday—each accusing him of participation in the murder—he confessed. There was no evidence of physical brutality, no request for counsel, nor, unlike *Turner* v. *Pennsylvania,* 338 U. S. 62 (1949), for relatives or friends. Nor did he ask for food or make any indication of any desire or need therefor, showing, in the light of the record, nothing more than the lack of interest in food of one who had suffered from stomach ulcers for years. How the Court can now—25 years later—find on this "cold" record that these circumstances amounted to

---

the taking of one of the statements, and he said he saw no bruises on the petitioner and the petitioner made no complaint to him. I do not believe there is sufficient evidence before this Court to disturb the finding of the jury."

mental or psychological coercion is beyond my comprehension. I agree with the score of judges who have decided to the contrary.

Since mental coercion is the keystone of its rationale, the Court properly sets to one side the cases involving physical brutality, e. g., Brown v. Mississippi, 297 U. S. 278 (1936). While they dealt with factors bearing upon the mental state of the defendants, the Court properly distinguishes cases involving threats of mob violence, the wearing down of the accused by protracted questioning, threats against members of the defendant's family, and those in which deception was practiced.[3] Nor can Reck be classified as a mental defective, as was the case in Blackburn v. Alabama, 361 U. S. 199 (1960).

The Court relies heavily on Turner v. Pennsylvania, supra. I do not agree that it presented this Court with "a totality of coercive circumstances" significantly less "aggravated" than the situation presented here. In Turner the Court reviewed the Pennsylvania Supreme Court's affirmance of petitioner's conviction by a jury. In the present case no claim is made that the codefendants' confessions, with which Reck was confronted, were in fact not made and did not in fact implicate Reck in the murder of which he was convicted. In Turner, however, the petitioner "was falsely told that other suspects had 'opened up' on him." 338 U. S., at 64. Such a falsification, in my judgment, presents a much stronger case for relief because at the outset Pennsylvania's officers resorted to trickery. Moreover, such a psychological artifice tends to prey upon the mind, leading its victim to either resort to countercharges or to assume that "further resistance [is] useless," and abandonment of claimed innocence the only course to follow.

---

[3] E. g., Payne v. Arkansas, 356 U. S. 560 (1958); Ashcraft v. Tennessee, 322 U. S. 143 (1944); Harris v. South Carolina, 338 U. S. 68 (1949); Spano v. New York, 360 U. S. 315 (1959).

Further, the issue of voluntariness of the confession in *Turner* was submitted to the jury, but the trial judge refused to charge "that in considering the voluntariness of the confession the prolonged interrogation should be considered." At p. 65. And the appellate court considered it an indifferent circumstance that "a convicted murderer" was held five days in jail. 358 Pa. 350, 356, 58 A. 2d 61, 64. Finally, in *Turner* the "Supreme Court of Pennsylvania affirmed the conviction in an opinion stressing the probable guilt of the petitioner and assuming that the alternatives before it were either to approve the conduct of the police or to turn the petitioner 'loose upon [society] after he has confessed his guilt.'" 338 U. S., at 65. This Court might well have disagreed in that case with findings so made, and, with less hesitation than is appropriate here, where the determinations of voluntariness have been so constant and so numerous, have reached an opposite conclusion. In this case we are not considering the validity of a conviction by certiorari to the court affirming that judgment. Voluntariness has not been here inadequately tested by a standard which refuses to take account of relevant factors. Cf. *Rogers* v. *Richmond,* 365 U. S. 534 (1961). To the contrary, a proper standard has been successively applied by at least two trial courts and several appellate courts, no one of which felt itself forced to choose between what it considered equally undesirable results, and with whose conclusions this Court may not so lightly disagree.

Similarly, in *Fikes* v. *Alabama,* 352 U. S. 191, 196–197 (1957), also relied on by the Court, the confession was wrung from an "uneducated Negro, certainly of low mentality, if not mentally ill." Fikes "was a weaker and more susceptible subject than the record in that case reveals Turner to have been." Unlike Reck, Fikes was removed from the local jail to a state prison far from his home and the Court recognized that petitioner's location was a fact

"to be weighed." So, too, in *Fikes* the petitioner's lawyer was barred from seeing him, unlike the situation here, where no request for counsel was made.

Of course, I agree with the Court that confession cases are not to be resolved by color-matching. Comparisons are perhaps upon occasion unavoidable, and may even be proper, as in a case "on all fours" whose facts approach identity with those of the one claimed apposite. I do not find that to be the situation here, however. In my view, the Court today moves onto new ground, and does not merely retread the steps it took in *Turner*. In my judgment, neither the elusive, measureless standard of psychological coercion heretofore developed in this Court by accretion on almost an *ad hoc*, case-by-case basis, nor the disposition made in *Turner* requires us to disagree with more than a score of impartial judges who have previously considered these same facts. Perhaps, as these cases indicate, reasonable minds may differ in the gauging of the cumulative psychological factors upon which the Court bases its reversal, but in what case, I ask, has a court dealing with the same extrinsic facts, a quarter of a century after conviction, overturned so many decisions by so many judges, both state and federal, entirely upon psychological grounds? When have the conclusions of so many legal minds been found to be so unreasonable by so few?

Certainly, I walk across this shadowy field no more sure-footedly than do my Brothers, but after reading the whole record and the opinions of all of the courts that have heard the case I am unpersuaded that the combined psychological effect of the circumstances somehow, in some way made Reck speak. The fact is, as the Court of Appeals said, when confronted with and accused by all three of his confederates, Reck knew the "dance was over and the time had come to pay the fiddler," quoting from Mr. Justice Jackson's opinion for the Court in *Stein* v. *New York,* 346 U. S. 156, 186 (1953).