**UNITED STATES of America ex rel. Richard W. MATTOX, Petitioner,**

**v.**

**Herbert SCOTT, Respondent.**

**No. 73 C 1396.**

United States District Court,
N. D. Illinois, E. D.
March 11, 1974.

Clarence O. Redman, Price, Cushman, Keck, Mahin & Cate, Larry S. Goldberg, Chicago, Ill., for petitioner.

William J. Scott, Atty. Gen., for the State of Illinois, Mark Zubor, Asst. State's Atty., for Cook County, Chicago, Ill., for respondent.

## OPINION

AUSTIN, District Judge.

This is a petition for issuance of a writ of habeas corpus pursuant to 28 U. S.C. § 2254. In a previous opinion,[1] respondent's motion to dismiss for failure to state a claim was granted in part. The central issue that remained was whether petitioner's Sixth Amendment right to counsel during custodial interro-

---

1. United States ex rel. Mattox v. Scott, 366 F.Supp. 1294 (N.D.Ill.1973).

gation, as established in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964), was violated. At the time of that opinion there appeared to be genuine issues of material fact as to the *Escobedo* issue, and therefore respondent's alternative motion for summary judgment was denied. Since that time, a transcript of petitioner's trial was made available to this Court; and a close examination of it has made it apparent that the alleged constitutional error at trial was not committed. The subject of this opinion is a reexamination of the questions presented by respondent's motion for summary judgment in light of this fact.

## I.

The chronology in this case, as determined from all the pertinent documents on file, is as follows:

Richard Wayne Mattox was 31 years old when he was arrested and questioned by the police in connection with the murder of Harvey Weinstein. He was in relatively good physical health at the time of his arrest. His education is not extensive, not going beyond the eighth grade. Mentally and emotionally he appears to have been stable. Prior to trial a hearing was had regarding his competency to stand trial and a finding was made that he was competent. The hearing was deemed necessary because on two prior occasions in the early 1950's he was twice confined to state mental hospitals—once for a year and again for four months.

On October 1, 1963, at 6 a. m. Mattox was arrested without a warrant for the murder of Harvey Weinstein. He was taken to the Bedford Park Sheriff's Police Station, where he remained in custody until 5 p. m. Once during that time he was handcuffed to a chair and pushed to the floor by an unidentified deputy sheriff. Otherwise, there is no indication of any physical abuse, and Mattox was not injured in any way. In fact, when Mattox was. shoved, the Chicago Police Officers who later interrogated him told the deputy to leave him alone.[2]

During the last two hours of his confinement at the Sheriff's Office, Mattox was questioned by the Chicago Police. He admitted to them that he and the victim's wife had had an ongoing sexual relationship. He also admitted facts which implicated himself and Mrs. Weinstein in the murder. At 5 p. m. he was released into the custody of the Chicago Police Department and taken to headquarters. He was not taken before a magistrate at that time.

When he arrived at the police station, he was given ham sandwiches, milk and coffee. At 8 p. m. the police began questioning him, and continued to do so until 11 p. m., when he was given a lie detector test. At midnight the police again questioned him and continued until approximately 2 a. m. It was during this two hour period that a court reporter recorded Mattox's answers to the questions put to him by Assistant State's Attorney Joseph McDermott.

By the time the questions ceased, Mattox had admitted in his recorded statement the following facts: (1) he was having an affair with Mrs. Weinstein; (2) he knew she wanted to do away with her husband; (3) he knew that an unidentified person he was with on the night of the murder was going to try to kill Harvey Weinstein; (4) Mattox was at the Weinstein home the night of the murder; and (5) he shoved Harvey Weinstein through a doorway and saw Mrs. Weinstein hit him on the head with a heavy object. This statement was admitted into evidence at Mattox's trial as Exhibit 24. It was also used, as will be discussed below, to cross examine him at the motion for a new trial made by his co-defendant, Mrs. Weinstein.

Mrs. Weinstein was tried as a co-defendant in a severed trial about three months prior to Mattox's trial, and was found guilty. She then moved for a new trial on the ground of newly discovered evidence, i. e., Mattox's testimony. Mat-

2. Tr. 380.

tox took the stand and testified against the advice and over the objections of his attorney. Prior to testifying, he was thoroughly warned by the judge that anything he said could be used against him at his approaching trial.[3]

In substance, Mattox testified on direct examination that neither he nor Mrs. Weinstein had anything to do with the murder, but rather, that Harvey Weinstein left his home unharmed in the company of another man named Shelton. Mattox contended at the hearing that Shelton was the murderer and that he had admitted killing Weinstein. On cross examination, Mattox was questioned as to each question and answer contained in the statement taken by the court reporter at police headquarters (which became Exhibit 24 at his trial). He denied he ever gave a statement before a court reporter; and he denied he ever implicated Mrs. Weinstein in the murder. A copy of his statement was then admitted into evidence for the purpose of impeachment by prior inconsistent statement. Subsequently, at his own trial, a transcript of Mattox's testimony was admitted into evidence as Exhibit 25.

The significance of Mattox's testimony at the Weinstein hearing is that he described the conditions under which he was interrogated. In particular, he described the advice the police gave him concerning his constitutional rights. Although his testimony is often contradic-

tory and confusing, the following facts are clear: (1) before the Chicago Police questioned Mattox they advised him that he had a right to consult an attorney[4] and that he had a right to refuse to sign any written statements tendered to him by the police;[5] (2) he was also advised of his right to remain silent;[6] (3) in accordance with this advice, he attempted to call his attorney but without success;[7] and (4) he testified that thereafter, he relied upon the advice the police had given him by refusing to either say[8] or sign[9] anything.

At Mattox's trial, counsel stipulated that if the court reporters were called, they would testify that Exhibits 24 and 25 are accurate records of what Mattox said at the police station and at the Weinstein hearing, respectively.[10]

## II.

Two questions are presented for decision here: (1) whether Mattox's right to counsel during custodial interrogation, as established in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L. Ed.2d 977 (1964) was denied, given the above circumstances; (2) whether he made the incriminating statement before the court reporter, and if so, whether that statement was made voluntarily. For the following reasons, it is concluded that Mattox was neither denied his *Escobedo* rights nor coerced into giving the statement. As a result, the statement was properly admitted into evi-

---

3. Tr. 300.

4. "Q You were advised by Lt. Cartan that you were entitled to a lawyer?
   A That's right. And so did Officer Bob.
   Q You were advised that. As soon as you came into their custody, they told you you were entitled to a lawyer, didn't they?
   A Them two did, yes." Tr. 379.

5. In describing the advice Lt. Cartan of the Chicago Police Department gave him, Mattox said:
   "[H]e says, 'Dick, you're all excited,' he says, 'calm down,' he says. And he says, 'If you didn't do it or she didn't do it, don't push the blame off onto no one and don't sign no statements.'" Tr. 378.

6. "Q After you were advised of your legal rights by Lt. Cartan at the Sheriff's Station, did you tell him what happened the night of September 30th?
   A He told me not to say anything, so I didn't say nothing.
   Q He told you not to say anything and you said nothing, in the Sheriff's Station, is that correct?
   A I said nothing from then on." Tr. 381–82.

7. Tr. 392–93.

8. See n. 6, *supra*.

9. Tr. 390–91.

10. Tr. 261–63

dence at trial. Accordingly, it is further concluded that the motion of the State for summary judgment should have been, and therefore is, granted.

### III.

At the outset, it should be noted that the question presented for decision here is governed by principles enunciated by the Supreme Court prior to its decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); for the trial in this case commenced on August 16, 1965—prior to the date of decision in *Miranda.* Johnson v. New Jersey, 384 U.S. 719, 726–735, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). With this in mind, the following discussion is restricted to Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and its predecessors.

#### A. *The Escobedo Issue*

The facts in Escobedo v. Illinois, *supra,* are relatively simple: The accused had retained an attorney prior to his arrest for murder. When he learned of the arrest, counsel went to police headquarters where his client was in custody. The police denied him access to his client; and when Escobedo himself requested to see his attorney, the police refused. Eventually, a confession was elicited from him which was entered in evidence at trial. In reversing the conviction, the Supreme Court said:

> "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested an opportunity to consult with his lawyer, *and the police have not effectively warned him of his absolute constitutional right to remain silent,* the accused has been denied 'the Assistance of Counsel' in violation of the

Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. 335, at 342, 83 S.Ct. 792, 9 L.Ed.2d 799, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. at 490–491, 84 S.Ct. at 1765 (emphasis added).

In the present case, the police investigation had obviously begun to focus on Mattox as the killer when he was arrested and interrogated. Furthermore, the undisputed facts show that he had requested permission to call his attorney, that he was given that opportunity, but that counsel could not be contacted. However, Mattox admitted that the police advised him not only of his right to refuse to sign anything, but also of his right to remain silent.[11] From these facts, it can only be concluded that Mattox was effectively warned by the police of his absolute constitutional right to remain silent and that therefore, his right to counsel during custodial interrogation, as guaranteed by Escobedo v. Illinois, *supra,* was not violated.

#### B. *The "Voluntariness" Issue*

At the outset, it is noted that defense counsel did not raise the question of whether Mattox voluntarily gave the statement to the police; and the issue is not directly raised in the instant petition. Nevertheless, in view of the facts in this case, a brief treatment of the issue is deemed appropriate.

In the first place, it is clear from the record that Mattox did in fact make a statement to the police before a court reporter. At trial, defense counsel stipulated that if the reporter were called he would testify his notes reflect that Mattox made the alleged statement. Furthermore, there was no testimony at trial to the contrary. Thus, the trial judge obviously concluded, and correctly so, that Mattox did indeed make the

---

11. See nn. 4–6, *supra.*

statement. Accordingly, he admitted it into evidence.

The question then becomes whether Mattox's statement to the police, as recorded by the court reporter, was given voluntarily.

It is firmly established under the Due Process Clause of the Fourteenth Amendment that convictions following the admission into evidence of incriminating statements which are "involuntary", i. e., the product of coercion, either physical or psychological, cannot stand. Rogers v. Richmond, 365 U.S. 534, 540, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). The test of voluntariness is whether, under all the attendant circumstances, the statement is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired. Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (Frankfurter, J.). The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the statement. *Id.*

Among the factors considered in determining whether a statement was voluntary are the following: whether the accused was physically abused; [12] whether he was threatened with abuse; [13] whether he was deprived of food, sleep or medical attention; [14] whether there was a lengthy or grueling interrogation; [15] whether there was a lengthy detention of the accused before he gave the statement in question; [16] whether he was ill, injured, intoxicated or drugged when he gave the statement; [17] whether he was deceived or tricked into giving the statement; [18] whether there was an unreasonable delay in bringing him before a magistrate before he gave the statement; [19] the age of the accused; [20] whether he had a low

12. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (vomiting blood as the result of beatings); Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (extorting confessions by repeatedly hanging accuseds by their necks from a tree and whipping them with leather straps).

13. Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (police threat to turn accused over to a mob which had gathered outside the jail).

14. Payne v. Arkansas, *supra* (accused received 2 sandwiches and 1 breakfast meal during a period of over 40 hours); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (keeping accused awake for 36 straight hours); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (withholding emergency operation until police questions had been answered).

15. Ashcraft v. Tennessee, *supra*, n. 14; Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (8 hour daily interrogation sessions for a week).

16. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961) (accused held *incommunicado* and without arraignment for 5 days until he confessed); Reck v. Pate, *supra* (accused held 8 days without hearing, before he confessed). *But see* Gallegos v. Nebraska, 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951) (holding accused for 25 days before bringing him before a magistrate does *not* violate due process).

17. Jackson v. Denno, *supra* (accused suffering from gunshot wounds and under the influence of pain killing drugs when he was questioned); Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (accused administered drugs to ease symptoms of withdrawal from heroin, which drugs acted as truth serum).

18. Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959) (accused induced to confess out of falsely aroused sympathy for his friend who was a police officer); Leyra v. Denno, 347 U.S. 556, 74 S. Ct. 716, 98 L.Ed. 948 (1954) (accused delivered to a psychiatrist who pretended to be a physician who would treat accused's sinusitis, which psychiatrist proceeded to elicit a confession from the accused by bringing to bear psychological pressure).

19. Culombe v. Connecticut, *supra*, n. 16; Reck v. Pate, *supra*, Gallegos v. Nebraska, *supra*, n. 16.

20. Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), reh. denied 370 U.S. 965, 82 S.Ct. 1579, 8 L.Ed.2d 835 (14 year old accused); Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (15 year old accused).

or disturbed mentality;[21] the extent of his previous experience with the police;[22] whether he had the advice of an attorney;[23] and whether he was advised of his right to remain silent.[24]

■ In the present case, it is true that Mattox was pushed to the floor once by a deputy sheriff, but this abuse was not repeated. Coupled with the fact that he was thereafter protected by the Chicago Police, it must be concluded that this one incident of physical abuse did not affect in any way Mattox's ability or will to resist giving the statement during his subsequent interrogation if he had been so inclined. Furthermore, there is no evidence that the police threatened to abuse him.

As Mattox himself testified, he was fed by the police during the period of his interrogation. There is no evidence that he was in need of medical care; and he was not kept awake for an unreasonable length of time. The interrogation ended at 2 a.m. Furthermore, the interrogation lasted a total of seven hours; and the three sessions were broken up by a three hour interval from 5 to 8 p. m. and a one hour interval at 11 p. m. to 12 a. m. Since Mattox had been under arrest for only 20 hours by the time the police finished questioning him, it cannot be said that the period of his detention before he gave the statement was unreasonably long. There is no evidence that he was intoxicated during his interrogation, nor that he was deceived or tricked by the police into giving the statement. Although he contends in his petition that the police only told him that his rights would be protected if he did not sign anything, he also admitted at the Weinstein hearing that the police informed him of his right to remain silent.[25]

■ Although it is true that the Chicago Police did have an opportunity to bring Mattox before a magistrate when they took him to headquarters, it cannot be said that the delay here reached unreasonable proportions under Illinois law, such that his statement was rendered inadmissible.[26] For example, it was held in People v. Taylor, 40 Ill.2d 569, 574, 241 N.E.2d 409 (1968) that a delay of 72 hours before bringing the accused before a magistrate will not *per se* render his confession involuntary. Rather, it was merely another factor to be considered. *Id. See also* People v. Reader, 26 Ill.2d 210, 218, 186 N.E.2d 298 (1962) (delay of 44 hours before

21. Reck v. Pate, *supra* (accused, a 19 year old borderline mental retardate who dropped out of the 7th grade at age 16, had the intelligence of a 10 year old) ; Culombe v. Connecticut, *supra* (accused, a 33 year old mental defective of the moron class with I. Q. of 64 and a mental age of 9, was wholly illiterate).

22. Reck v. Pate, *supra* (no previous police experience).

23. Culombe v. Connecticut, *supra* (accused requested, but denied opportunity to speak to an attorney). *See also* Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

24. *See* Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

25. See n. 6, *supra*.

26. It is well established that the federal standard at the time of the trial in this case, which is embodied in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), does not reach constitutional proportions and therefore does not apply to state prosecutions. Gallegos v. Nebraska, 342 U. S. 55, 64, 72 S.Ct. 141, 96 L.Ed. 86 (1951). In fact, the Court in *Gallegos* held that a delay of 25 days before bringing the accused before a magistrate will not in itself render his confession involuntary and therefore inadmissible in a state prosecution. Lastly, it is noted that the standard contained in 18 U.S.C. § 3501(c), which requires that an accused be brought before a magistrate within 6 hours' of his arrest, was enacted after the trial in the present case and therefore is inapplicable. Sheer v. United States, 414 F.2d 122, 125 (5th Cir. 1969), cert. den., 396 U.S. 946, 90 S.Ct. 387, 24 L.Ed.2d 249 ; nor is that standard even applicable to state prosecutions. *See* Commonwealth v. Ware, 438 Pa. 517, 265 A.2d 790 (1970).

bringing the accused before a magistrate, which delay may have been unnecessary, was not so unreasonable as to vitiate the voluntariness of his confession). Moreover, Mattox has admitted facts which established that the police effectively advised him of his rights to consult an attorney, to refuse to sign anything and to remain silent. Therefore, any delay in bringing Mattox before a magistrate cannot possibly have rendered his statement involuntary.

Lastly, Mattox was a grown man of 31 years of age. Although his education was not extensive and his intelligence not the highest, he was well-acquainted with police methods; for he had been accused of crimes on prior occasions and had been convicted twice. Any disadvantage he may have suffered as the result of his lack of education or intelligence was compensated for by his experience with the police.

From this brief analysis, it is clear that the circumstances surrounding Mattox's interrogation, when taken as a whole, did not create a coercive atmosphere which can be said to have been sufficient to overbear his will to resist saying what he said. What is most significant here is the fact that before the police questioned Mattox, they advised him that he could refuse to say anything if he so desired. It is therefore concluded that his statement to the police was voluntary.

### IV.

In summary, this Court today finds the following: there is no genuine dispute as to any material fact; petitioner's right to counsel under Escobedo v. Illinois was not violated; and petitioner gave the statement to the police voluntarily. Therefore, this Court holds that the trial judge did not commit a constitutional error when he admitted the statement into evidence. It is further held that summary judgment should be, and therefore is, entered in favor of the respondent. The case is dismissed.

So ordered.