NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0750n.06

No. 15-1294

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Nov 16, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CURTIS LEWIS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CINDI CURTAIN, Warden, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE: GIBBONS and McKEAGUE, Circuit Judges; ANDERSON, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Curtis Lewis appeals the district court's denial of his petition for a writ of *habeas corpus* under 28 U.S.C. § 2254(d) based on an ineffective assistance of counsel claim. For the reasons set forth in this opinion, we affirm the district court's judgment and deny Lewis's *habeas* petition.

**I.**

Lewis was convicted after a jury trial of the robbery of the Check 'N Go in the City of Jackson, Michigan. Lewis confessed to this offense after having been identified as a suspect. The confession gave rise to his habeas claims.

---

[*] The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

**A.**

At approximately 4:48 PM on April 13, 2009, a man wearing a hooded sweatshirt entered the Check 'N Go, pulled a bandana over his face, indicated that he had a gun, announced that it was a hold up, and demanded that employees Ashley Sanders and Wendy Alexander get down on the ground. According to Sanders, the robber said, "You have three seconds to open the fucking drawer or else I'm going to blow your head off, bitch," at which point Sanders and Alexander helped the robber access the drawers and safe. DE 8-4, Aug. 17 Trial Tr., Page ID 380. Although no witness saw the robber's gun, Sanders testified that the robber had his hand in his pocket in such a way that "it looked like a gun." *Id.* at 382. The robber took approximately $3,100 from the cash drawers and store safe. Sanders testified that the robber told her and Alexander to sit down for thirty seconds "or else I'm going to blow this bitch up," which Sanders took to mean that he would shoot up the store. *Id.* at 381. The robber then fled the Check 'N Go. At the same time that the robber was fleeing the store, Alexander's mother, Brenda Wyman, was stopping by to visit her daughter at work. Wyman testified that she saw a man wearing a hooded sweatshirt attempting to run as he left the store, but that he "was being slowed down by something heavy or awkward in his right side pockets." *Id.* at 440.

Both Sanders and Alexander helped detectives to identify Lewis as the robber, with Sanders testifying that Lewis had visited the Check 'N Go earlier that day and been used as a reference by another customer. Given the bandana over the robber's face, neither Sanders nor Alexander could definitively identify Lewis as the robber. However, both testified that the robber had the same size, build, and complexion as Lewis. During trial, Wyman testified that the man she saw fleeing the store after the robbery had the same approximate build, weight, and complexion as Lewis, although she could not identify the robber's face because he was wearing a

hood when he fled. The robber was wearing a gray hooded sweatshirt and white tennis shoes. Sanders and Alexander further testified that the gray hooded sweatshirt and white tennis shoes seized from Lewis's home looked like the ones the robber wore during the robbery. Wyman testified that the gray hooded sweatshirt from Lewis's home had the same "general style and color" as the one the robber was wearing.

**B.**

Jackson Police Department Detectives Ed Smith and Serg Garcia investigated the Check 'N Go robbery and identified Lewis as their suspect after discovering that he had visited the store on the day of the robbery and that he matched the physical description of the robber. Lewis voluntarily reported to the Jackson Police Department on April 22, 2009, at approximately 10:30 AM, for an interview. Lewis was not under arrest at this time.

Smith recorded this interview, and he played the recording for the jury. Smith testified that his strategy during the interview was "to minimize the crime," so that Lewis would not be "as reluctant to tell [him] what happened." *Id.* at 459–60. Lewis admitted that he had visited the Check 'N Go earlier in the day of April 13, 2009, but at first, he denied knowing anything about the robbery. Specifically, Lewis stated, "I didn't do it. I promise to God I didn't." *Id.* at 483. Smith continued to minimize the crime, and he even suggested that given the troubled economy, he would understand if someone committed a robbery to support their family, saying that "[y]ou got to do what you got to do to stay alive." *Id.* at 488. Smith distinguished this robbery from more serious, violent crimes, and he told Lewis that they needed "to work together to minimize this," so that Lewis would not be imprisoned. *Id.* at 480. Smith said that if Lewis confessed, he could make the case "go away." *Id.* at 491. Nevertheless, Lewis maintained that he didn't commit the robbery, repeating "I didn't do it. I promise to God I didn't do it." *Id.*

3

Eventually, Smith changed tactics and discussed restitution, even though Lewis had not yet admitted any involvement in the robbery. When Smith asked Lewis whether he would be willing to pay restitution to the store, Lewis responded, "Yeah, I'll pay it." *Id.* at 492. In response to Smith's question about how much Lewis would owe, he said, "Probably like three, four something." *Id.* at 493. At trial, Smith explained that in his experience, "Someone that did not take it would not say yeah, I'll pay restitution." *Id.*

At this point, Garcia entered the interview room and began to question Lewis. Like Smith, Garcia minimized the robbery, classifying the crime as "[a] misdemeanor or a bullshit larceny" and explaining that "[n]o one's trying to take you up on a robbery." *Id.* at 496. Garcia told Lewis that "[w]e need to fix this mistake, you understand me? We're not going to arrest you, okay? Even when we been talking here no one's going to arrest you, okay? But the only thing is, we want to fix this, you understand me?" *Id.* at 498–99. Garcia repeated that "[t]he last thing we want to do is put someone in your shoes in a jail cell." *Id.* at 501. Garcia asked Lewis about whether he used a gun, to which Lewis responded, "I don't own a gun." *Id.* When Garcia said that "you stole their money at best," Lewis answered, "That's it." *Id.* at 502. Garcia pressed Lewis about whether "you guys spent all the money that you got the second time at the Check 'N Go," to which Lewis again responded, "That's it." *Id.* Garcia then asked Lewis a second time about whether he had a gun or if he had his hand in his pocket to look like a gun, to which Lewis answered, "Maybe I had my hand up here. It happened too fast." *Id.* at 504. After Garcia asked what Lewis had said to the store employees, Lewis said, "Just give me the money, that's it." *Id.* at 507.

After Lewis's confession, Garcia told him that he would have to contact the prosecutor, who would decide what to do next. According to Smith, the prosecutor's office instructed the

4

detectives to re-interview Lewis after reading him his *Miranda* rights. At that time, Lewis signed a statement of rights form. This second interview was not recorded, as the batteries for the recording device had died, unbeknownst to Smith. Nevertheless, Lewis again confessed to Smith.

During trial, Smith admitted that he knew that Lewis had only had about two hours of sleep the night before his confession. Smith testified that Lewis had told him that he had trouble sleeping because he was nervous about the interview. Smith further testified that he misrepresented having the ability to make the case "go away," and he admitted that he did not have the authority to make the case "go away." DE 8-5, Aug. 18 Trial Tr., Page ID 554.

Lewis's trial counsel failed to challenge the voluntariness of Lewis's confession, although he argued to the jury that Lewis had falsely confessed because of the coercive environment during the interrogation.

## C.

At the conclusion of trial, the jury found Lewis guilty of armed robbery. At sentencing, the trial court sentenced Lewis to fifteen (15) to twenty (20) years imprisonment. Lewis appealed, and the Michigan Court of Appeals affirmed Lewis's conviction in an unpublished, *per curiam* opinion. *People v. Lewis*, No. 294687, 2011 WL 561596 (Mich. Ct. App. Feb. 17, 2011). On appeal, the court considered several ineffective assistance of counsel claims, one of which is relevant to the instant case. The court held that, based on a totality of the circumstances, there is no reasonable chance that had trial counsel moved to suppress Lewis's statements to the police because they were coerced, Lewis's statements would have been suppressed. *Id.* at *4. The court found that "defense counsel made a reasonable decision to simply argue to the jury that the officers' deception undermined the credibility of the confession." *Id.* The Michigan Supreme

5

Court declined to review the Court of Appeals' decision on Lewis's ineffective assistance of counsel claims, issuing a one-page order dealing only with an unrelated sentencing matter. *People v. Lewis*, 489 Mich. 939 (2011).

Lewis filed his petition for a writ of *habeas corpus* on August 29, 2012. In the petition, Lewis asserted five claims, only one of which is the subject of this appeal. The district court denied the petition, but granted Lewis a certificate of appealability with respect to his claim that trial counsel was ineffective for failing to move to suppress Lewis's coerced confession. *Lewis v. Curtain*, No. 12-CV-13819, 2015 WL 803236, at *12 (E.D. Mich. Feb. 26, 2015).

## II.

## A.

In an appeal of a § 2254 *habeas* action, we review the district court's legal conclusions *de novo*. *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014). "Factual determinations are generally reviewed for clear error, except where the district court has made factual determinations based on its review of trial transcripts and other court records. In such cases, because no credibility determination or findings of fact are required, factual conclusions are reviewed de novo." *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006) (internal quotation marks and citations omitted). A state court's determination of factual issues "shall be presumed to be correct" unless the petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs Lewis's *habeas* petition. AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* §2254(d).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Id.* at 405–06. A state court's decision is an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.*

The phrase "clearly established Federal law" in § 2254(d)(1) "refers to the *holdings*, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412 (emphasis added). The Supreme Court recently reaffirmed that AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'" *Lopez v. Smith*,

135 S. Ct. 1, 2 (2014) (per curiam). "Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" *Id.* at 4 (quoting *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013)).

The Supreme Court's holding in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the "clearly established Federal law" relevant to Lewis's claim of ineffective assistance of counsel. *See Williams*, 529 U.S. at 390–91. To prevail on an ineffective assistance of counsel claim, a petitioner must first "show that counsel's performance was deficient" by "an objective standard of reasonableness," meaning that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. This means that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Under *Strickland*, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The *Strickland* inquiry coupled with AEDPA review is doubly hard to meet. As the Supreme Court has previously described:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

8

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citations omitted). Stated another way, "[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002) (internal citation omitted). Therefore, in this case, Lewis must establish that the state court's determination regarding his confession was unreasonable in light of Supreme Court precedent. The "clearly established Federal law" that pertains to the voluntariness of Lewis's confession comes from *Schneckloth v. Bustamonte*, in which the Supreme Court held that confessions must be voluntary, and that voluntariness is determined based on a totality of the circumstances. 412 U.S. 218, 225–26 (1973).

We review the decision of "the last state court to issue a reasoned opinion on the issue" raised in a *habeas* petition. *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (internal quotation marks omitted). The Michigan Court of Appeals' opinion on Lewis's claims "is the last state court to adjudicate the claim on the merits" and is therefore "[t]he relevant state court decision." *See Pudelski v. Wilson*, 576 F.3d 595, 607 (6th Cir. 2009).

The issue before us is whether the Michigan Court of Appeals unreasonably applied federal law to conclude that Lewis was not denied the effective assistance of counsel where trial counsel failed to challenge the admissibility of his confession to the police. The state court based its conclusion that the confession was voluntary on the totality of the circumstances, including Lewis's limited sleep and the officers' deception. *See Lewis*, 2011 WL 561596, at *4. That court reasoned that "[b]ecause a motion to suppress [Lewis's] statements would have likely failed, defense counsel was not ineffective for failing to make such a motion. Rather, defense

9

counsel made a reasonable decision to simply argue to the jury that the officers' deception undermined the credibility of the confession." *Id.* Accordingly, the state court denied Lewis's ineffective assistance of counsel claim. *Id.* at \*4–5. Thereafter, the district court denied Lewis's *habeas* petition, finding that although the issue of whether Lewis's will was overborne was a "very close question," "the Michigan Court of Appeals reasonably found that the officer's tactics were not so coercive as to overbear Petitioner's will." *Lewis*, 2015 WL 803236, at \*10.

Under clearly established Supreme Court law, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). The "tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Id.* at 110. The question is "whether a defendant's will was overborne at the time he confessed." *Reck v. Pate*, 367 U.S. 433, 440 (1961). In determining whether a defendant's will was overborne, courts must consider the totality of the circumstances surrounding the confession, including the characteristics of the defendant and the details of the interrogation. *Schneckloth*, 412 U.S. at 226. Factors considered in assessing the totality of the circumstances include the age, education, and intelligence of the defendant; whether the defendant was informed of his *Miranda* rights; the length of the defendant's detention; the repeated and prolonged nature of questioning; and the use of physical punishment, such as deprivation of food or sleep. *Id.* No single criterion is controlling in this inquiry. *Id.* Determining whether a confession is voluntary requires "a careful scrutiny of all the surrounding circumstances." *Id.*

10

Based upon the totality of the circumstances in this case, it was objectively reasonable for the Michigan Court of Appeals to hold that Lewis's confession was voluntary, and, therefore, that Lewis was not denied the ineffective assistance of trial counsel. Although Lewis's lack of sleep and Smith and Garcia's minimization tactics were perhaps coercive, even under these circumstances, it was not objectively unreasonable for the Michigan Court of Appeals to hold that Lewis's will was not overborne. Supreme Court precedent makes clear that no single factor is outcome-determinative in this inquiry, and Lewis's lack of sleep is not serious enough to tip the scales in his favor. *See Brown v. Illinois*, 422 U.S. 590, 603 (1975). Lewis was not questioned overnight. *See Spano v. New York*, 360 U.S. 315, 322 (1959) (finding coercion where defendant did not confess until he was interrogated for eight hours by some fifteen interrogators). Nor did Smith and Garcia contribute to Lewis's sleep deprivation. *See Reck*, 367 U.S. at 441 (finding coercion where defendant was held for more than a week without a judicial hearing and was subjected daily to six- or seven-hour stretches of "relentless and incessant interrogation"); *Leyra v. Denno*, 347 U.S. 556, 558–59 (1954) (finding coercion where police questioned the defendant until 11 PM on Tuesday, from 10 AM until midnight on Wednesday, from 9 AM Thursday until 8:30 AM Friday, and resumed questioning Friday at 5 PM after allowing the defendant only one and a half hours of sleep). Although Lewis informed Smith that he had only had two hours of sleep the night before, Lewis attributed this to his nerves about reporting for an interview. It cannot be overstated that Lewis voluntarily showed up for the interview, and that his lack of sleep was in no way due to police misconduct.

Likewise, Smith's and Garcia's deceptive tactics, which entailed minimizing the crime and telling Lewis that they could "make it go away," do not amount to the level of officer deception that could render a confession involuntary. Lewis cites no Supreme Court authority

11

for his assertion that officer deception constitutes coercion. Rather, Lewis cites circuit and district court opinions for that proposition. However, the Supreme Court in *Lopez* clearly held that only Supreme Court law qualifies as "clearly established Federal law" for purposes of *habeas* relief under § 2254(d). 135 S. Ct. at 4. Therefore, the Sixth Circuit's "rule that promises of leniency may be coercive if they are broken or illusory," *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir. 2003), is inapplicable to the instant *habeas* petition. Since there is no Supreme Court precedent that clearly establishes that a police officer's statement that he can "make it go away" is coercive, Lewis's claim must fail.

After all, as the Michigan Court of Appeals noted, "defendant was there voluntarily, it was not a particularly lengthy interview, the officers were not abusive, and defendant's answers did not suggest that he was confused because he was tired." *Lewis*, 2011 WL 561596, at *4. Lewis's lack of sleep and Smith's and Garcia's deception do not compel a finding otherwise. Even "if there is room for reasonable debate on the issue, the state court's decision to align itself with one side of the argument is necessarily beyond this court's power to remedy under § 2254, even if it turns out to be wrong." *Williams v. Bauman*, 759 F.3d 630, 636 (6th Cir. 2014). "Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24–25 (2002) (per curiam). Because it was a reasonable application of federal law for the Michigan Court of Appeals to hold that Lewis's confession was voluntary, it was also a reasonable application for it to hold that his trial counsel had not rendered ineffective assistance of counsel. To establish prejudice under *Strickland*, a petitioner must show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694.

12

Lewis cannot show that a motion to suppress would have succeeded, and thus he cannot satisfy the prejudice requirement of his ineffective assistance of counsel claim. Under the deference required by AEDPA, the decision of the Michigan Court of Appeals was a reasonable application of federal law.

For the reasons discussed above, we affirm the judgment of the district court and deny Lewis's petition for a writ of *habeas corpus*.